

1  Marc Rowin (S.B.N. 1039239)
   LYNCH ROWIN LLP
2  230 Park Avenue
   New York, New York 10017
3  Telephone: 212-682-4001
   Fax: 212-682-4003
4  Email: mrowin@lynchrowin.com

5
   David Paul Steiner (S.B.N: 64638)
6  DAVID STEINER & ASSOCIATES
   A Professional Corporation
7  1925 Century Park East, Suite 2350
   Los Angeles, CA 90067-6019
8  Telephone No.: (310) 557-8422
   Facsimile No.: (310) 274-8643
9  Cell Phone No.: (310) 556-0336
   E-Mail: dpsartnetlaw@earthlink.net
10
   Attorneys for Plaintiff
11 ONLINE PAYMENT SOLUTIONS INC.,

                    07 CIV 8692

                    -ECF CASE-

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ONLINE PAYMENT SOLUTIONS INC., ) Case No.:
a New York corporation,        )
                               ) COMPLAINT FOR:
       Plaintiff,              )
                               ) 1.  CONVERSION
   - against -                 ) 2.  AIDING & ABETTING
                               ) CONVERSION
SVENSKA HANDELSBANKEN A.B., a  ) 3.  AIDING & ABETTING
Swedish public company; PETER LARS ) FRAUD
JOHANSSON, an individual; NICHOLAS ) 4.  NEGLIGENCE
NOLTER, an individual; ERIC NOLTER ) 5.  NEW YORK UNIFORM
aka ARYKSIN NOBLE, an individual; ) DECEPTIVE TRADE
FACTOR EUROPE UK LIMITED, a    ) PRACTICES ACT (NY CLS
United Kingdom limited liability company, ) GEN BUS § 349)
and DOES 1-10,                 )
                               )
       Defendants.             )

                    DEMAND FOR JURY TRIAL

                    COMPLAINT                    1

Plaintiff ONLINE PAYMENT SOLUTIONS INC. ("OPS") by and through their undersigned counsel, brings this action against Defendants SVENSKA HANDELSBANKEN A.B. ("HANDELSBANKEN"), PETER LARS JOHANSSON ("JOHANSSON"); NICHOLAS NOLTER ("NOLTER"), ERIC NOLTER *aka* ARYKSIN NOBLE ("ERIC NOLTER."), FACTOR EUROPE U.K. LIMITED ("FACTOR EUROPE"), and DOES 1-10, (collectively "Defendants") and alleges as follows:

## NATURE OF ACTION

1. This is an action by OPS to recover over $6 million in funds looted from ECS World ("ECS") and, more precisely its merchants, including Menzia Trading Limited ("MENZIA"), whose claims have been assigned to Plaintiff. Defendants, in the guise of operating a credit card processing solution, implemented a massive fraudulent scheme. Using assorted bribes and profit-sharing inducements, Defendants were able to acquire an essential Visa/Mastercard merchant banking relationship and accounts through HANDELSBANKEN, imbuing themselves with the aura of legitimacy and reputability that concealed their prior history of rampant banking fraud.

2. Representing that their "Scandorder" processing solution would minimize settlement delays with Visa/Mastercard and optimize merchant receipt of credit-card funds, Defendants were able to acquire ECS' merchant payment transactions. In reliance on Defendants' representations, most focally the existence of the pivotal Visa/Mastercard approved merchant banking relationship through HANDELSBANKEN, ECS permitted Defendants to process millions of dollars in merchant payments. However, though

COMPLAINT                                                                 2

HANDELSBANKEN collected ECS' merchants' funds from Visa/Mastercard, Defendants failed to turn over $ 6,236,372 of such funds. Accordingly, Plaintiff now seeks compensatory and punitive damages, prejudgment interest, attorneys' fees, costs, and such other and further relief as this Court deems proper and just.

## THE PARTIES

3. Plaintiff OPS is a corporation organized and existing under the laws of the state of New York with its principal place of business in New York City, doing business in this District.

4. Plaintiff is informed and believes that Defendant HANDELSBANKEN is a Swedish public banking company with 456 branches worldwide, doing business in the State of New York. Defendant HANDELSBANKEN is transacting and doing business in this judicial district, and has maintained its branch office at 875 Third Avenue, New York, New York since at least 1987. Defendant is subject to the personal jurisdiction of this Court.

5. Plaintiff is informed and believes that Defendant JOHANSSON is an individual, residing in Sweden, transacting and doing business in the State of New York, within this judicial district, and is subject to the personal jurisdiction of this Court.

6. Plaintiff is informed and believes that Defendant NOLTER is an individual, residing at 4669 Kelly Drive, West Palm Beach, Florida, 33415, and transacting and doing business in the State of New York, within this judicial district, and subject to the personal jurisdiction of this court.

7. Plaintiff is informed and believes that Defendant ERIC NOLTER is an individual, residing in Fort Lauderdale, Florida, and transacting and doing business in the State of New York, within this judicial district, and subject to the personal jurisdiction of this court.

8. Plaintiff is informed and believes that Defendant FACTOR EUROPE is a

United Kingdom limited liability company, transacting and doing business in the State of New York, within this judicial district, and is subject to the personal jurisdiction of this court. FACTOR EUROPE was formed by Defendant JOHANSSON, who serves as the company's sole director.

9. On information and belief, the true names and capacities, whether individual, corporate, partnership, or otherwise of Defendants named herein as DOES 1-10, inclusive, are unknown and therefore Plaintiff sues Defendants by such fictitious names. Defendant DOES 1-10, upon information and belief, are transacting and doing business within this Judicial District, and are subject to the personal jurisdiction of this court. Plaintiff is ignorant of the true names of DOES 1-10 and will ask leave of Court to amend this complaint to show their true names and capacities when they have been ascertained.

10. Plaintiff is informed and believes that at all times, all Defendants herein, whether named or fictitiously designated were the agents, servants, employees, joint venturers, and/or the alter egos of the remaining Defendants, and the acts of each Defendant were within the course and scope of their agency, service, employment, and with permission, consent, and ratification of each other Defendant.

## JURISDICTION AND VENUE

11. This Court has original jurisdiction over this action pursuant to 28 U.S.C § 1332(a) subdivisions (1) and (2), in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between, the citizens of a State and citizens or subjects of a foreign state.

12. Venue for this action is proper in this district, pursuant to 28 U.S.C. § 1391. Defendants are doing business in this judicial district, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district. In addition, Defendant HANDELSBANKEN may be found in this judicial district and, has maintained its branch office in this judicial district since 1987. Defendants are subject to

personal jurisdiction in this district at the time of the commencement of this action, and venue for this action is, thus, properly within the Southern District of New York.

## COMMON FACTS

13. Plaintiff OPS is a New York corporation, which has been assigned the above-listed claims of ECS, a corporation duly organized and existing under the laws of the United Kingdom, which include the specific claims of MENZIA, a limited liability company organized and existing under the laws of the Republic of Cyprus.

14. MENZIA is a company engaged in the business of operating an online pharmacy, selling discount medications by prescription to consumers through its website. For example, New York consumers, whose doctors have issued them valid prescriptions, access MENZIA's website, and present and fill these prescriptions online, receiving their medications via mail.

15. Since 1999, ECS has been engaged in the business of assisting Internet merchants, such as MENZIA, with securing online payment solutions, essentially consisting of credit card processing software installed on the merchants' computers. New York consumers accessing merchant sites, such as MENZIA's, make their purchases in an online transaction, utilizing their credit cards for payment. In turn, the purchasers' credit cards are processed via an intricate payment system that properly culminates with the Visa/Mastercard funds being credited to the merchants' (e.g., MENZIA's) accounts.

## ECS' AGREEMENT WITH SCANDORDER

16. In July 2004, ECS entered into an agreement with Scandorder Inc. ("Scandorder"), also known as Scandor.com, for use of Defendants' credit card online processing solution. Plaintiff is informed and believes that Scandorder is a Florida Corporation created by Defendants NOLTER and ERIC NOLTER on May 5, 2004, just two months before the execution of the ECS agreement. NOLTER is also listed as sole officer and director of Scandorder.

17. Pursuant to such agreement, Defendants' Scandorder credit card processing solution was to be used to expedite payment transactions for ECS' merchant clients, including MENZIA. In order to induce ECS into entering such agreement, Defendants represented themselves as third-party processors acting "in cooperation with international acquiring banks" for the purpose of processing Internet online Visa and Mastercard credit card transactions. More specifically, Defendants represented that they had a Visa/Mastercard approved relationship through their acquiring bank, namely HANDELSBANKEN, a prominent, A+ rated international bank with hundreds of millions of dollars in assets. Defendants further represented that their Scandorder processing solution would minimize settlement delays with Visa/Mastercard and optimize ECS' merchants' timely receipt of full credit-card funds.

18. In reliance on Defendants' representations, most focally the existence of the pivotal Visa/Mastercard approved merchant banking relationship through HANDELSBANKEN, ECS, acting in its capacity as a 'master merchant,' agreed to use Defendants' technology to process ECS' merchants' transactions.

## INTERNET CREDIT CARD PROCESSING

19. Though it is far from transparent to users, Internet payment transactions require an elaborate chain of procedures, spanning multiple parties, and with consequent time-lags and delays. Consumers accessing the individual websites of ECS' merchants and selecting items for purchase only know that they are inputting their credit-card information as immediate payment for goods or services. In reality, while a merchant such as MENZIA may ship the items in question, it does not secure any actual funds until considerably thereafter.

20. In essence, MENZIA used the consumer's credit-card information to put in an order via Scandorder's third-party credit card processing solution to HANDELSBANKEN, as Defendants' acquiring bank. HANDELSBANKEN then put in

COMPLAINT                                          6

an order to Visa/Mastercard for eventual payment of funds to Defendants, who were then responsible for dispersing such funds to ECS.

21. At the outset, the funds in issue originated from consumers' credit cards drawn on "issuing banks," generally local to the consumer, and in this case including local New York banks. With authorization from Visa/Mastercard, these issuing banks had 'issued' credit cards to various consumers, who subsequently inputted the assigned credit card information into ECS' merchants' websites as a form of payment.

22. Having acquired the consumers' credit card information, the merchants' websites then relayed the credit-card transaction through Defendants' credit-card processing software. Defendants' software solution, in turn, transmitted the transaction to HANDELSBANKEN, Defendants' "acquiring bank," also known as a "merchant bank," and with which Defendants had a banking relationship. It is at this juncture that HANDELSBANKEN'S computers took over the transaction, performing the focal task of actually communicating with Visa/Mastercard to effect the retrieval and settlement of merchant funds.

### DEFENDANTS' PIVOTAL ACQUISITION OF A VISA/MASTERCARD MERCHANT BANKING RELATIONSHIP THROUGH HANDELSBANKEN

23. Defendants' Visa/Mastercard banking relationship through HANDELSBANKEN, as the acquiring or merchant bank, constituted the fundamental and operative link in Defendants' credit-card processing operation. On information and belief, merchant accounts are subject to rigorous and exacting pre-qualification requirements that make such accounts difficult to attain for many merchants. Without a merchant banking relationship, and the all-crucial merchant account, there can be no credit-card processing, and, thus, in actuality, no bona fide online business.

24. In effect, on information and belief, all merchant accounts must be sponsored by a Visa/MasterCard Acquiring Member Bank, such as HANDELSBANKEN, which bank is consequently responsible for ensuring that a

prospective merchant, like Defendants, is in strict compliance with Visa and MasterCard's rules and regulations. On information and belief, it is HANDELSBANKEN, as the acquiring bank, that was responsible for screening, investigating and endorsing Defendants, as one of the few select merchants from which it intended to "acquire" Visa/Mastercard transactions. Plaintiff is informed and believes and thereupon alleges that it is HANDELSBANKEN, therefore, that warranted to Visa/Mastercard that Defendants' originally met and, thereafter continued to meet, Visa/Mastercard's exacting rules and regulations promulgated with a view to preventing and protecting against fraud. It is this consequent apparent "approval" by Visa/Mastercard that also vested Defendants with the imprint of validity and legitimacy to outside merchants, such as ECS and MENZIA, causing such merchants to invest millions of dollars in processing funds.

25. On information and belief, under Visa/Mastercard rules and procedures, HANDELSBANKEN, as the acquiring bank, was obligated to subject Defendants to a mandatory, comprehensive verification process prior to execution of any merchant agreement. On further information and belief, such mandatory screening procedures included credit checks, background investigations, reference checks, physical inspection of the business premises and records, investigations concerning the owners, principals, or partners of the entities applying for the merchant account, and examination of the merchant's previous merchant agreements etc.

26. Plaintiff is informed and believes and thereupon alleges that Visa/Mastercard's security precautions, implemented with a view to preventing fraud, permitted HANDELSBANKEN as an acquiring bank to open accounts only for verified, established merchants. By opening such merchant account HANDELSBANKEN conveyed the message that Defendants were legitimate, reputable, and met with Visa/Mastercard's stamp of approval.

COMPLAINT                                   8

27. In the case at hand, once Defendants were accepted by HANDELSBANKEN as their acquiring bank, the Bank's computers essentially served as an indispensable gateway to Visa/Mastercard, relaying codes and security protocols on Defendants' behalf. After Visa/Mastercard approved the credit-card transactions, it dispensed the funds to HANDELSBANKEN. HANDELSBANKEN, in turn, deposited these funds into a "merchant account," from which such funds were transferred into an account in the name of FACTOR EUROPE. From the FACTOR EUROPE account, the funds were then to be wired to ECS' account, for eventual dispersal to the accounts of ECS' individual merchants. However, to date, millions of dollars of such funds remain unaccounted for by Defendants.

### DEFENDANTS' HANDELSBANKEN ACCOUNT ALLOWS THEM TO CONVERT $6 MILLION FROM PLAINTIFF

28. In executing their complicated scheme, Defendants worked in concert. Defendant NOLTER incorporated and ran Scandorder, and was involved in the development and operation of the software processing solution, including controlling its computer servers, located in both Florida and Sweden. On information and belief, Defendant NOLTER has an extensive history of involvement with assorted fraudulent business dealings. NOLTER's son, ERIC NOLTER ran Scandorder along with his father. ERIC NOLTER also served as the technical expert for the scheme; working along with his father, he was instrumental in designing the computer interfaces that communicated with the bank's computers, facilitating the processing of merchant funds, as well as the web page design and graphics. ERIC NOLTER also actively worked with HANDELSBANKEN'S computers and programers to process merchant funds. ERIC NOLTER was also a liaison between programmers and the bank, and upon information and belief actually physically met with HANDELSBANKEN at his father's request in order to help establish the banking relationship with HANDELSBANKEN that JOHANSSON brought to them.

COMPLAINT                                                                 9

29. Defendant JOHANSSON, working through Defendant FACTOR EUROPE and a now-bankrupt entity known as Scandinavian Net Logistics ("SNL"), was in charge of the key task of setting up the vital Visa/Mastercard banking relationship for Defendants. On information and belief, via (I) the payment of various kickbacks or bribes and/or (ii) by allowing HANDELSBANKEN employees to participate in the profits earned by Defendants' credit-card processing scheme (not to mention the fees that HANDELSBANKEN also earned for every transaction Defendants' processed), JOHANSSON was able to "purchase" the necessary and indispensable banking 'relationship' with HANDELSBANKEN, complete with the all-crucial "merchant account."

30. Accordingly, on or about June 2, 2004, Defendants and HANDELSBANKEN entered into a merchant banking agreement. The merchant agreement was set up in the names of SNL and Scandor.com. In turn, HANDELSBANKEN also opened a merchant account for JOHANSSON in a branch located in London in the name of an entirely different entity, FACTOR EUROPE, the United Kingdom limited liability company that JOHANSSON had formed only a mere two weeks earlier in May 2004. It was the FACTOR EUROPE account to which HANDELSBANKEN eventually dispersed ECS' Visa/Mastercard funds.

31. This, having established that crucial merchant banking relationship with HANDELSBANKEN in June 2004, and used such relationship to induce a processing agreement with ECS in July 2004, Defendants began their sophisticated fraudulent processing scheme. From August 23, 2004, through July 17, 2005 HANDELSBANKEN processed Defendants' Visa/Mastercard transactions, including those belonging to ECS, eventually dispensing such funds to the FACTOR EUROPE account. The relationship between Defendants and HANDELSBANKEN only terminated when Visa/Mastercard launched an investigation into HANDELSBANKEN and the Defendants, suspecting that there were violations of Visa/Mastercard's mandatory merchant rules. As a consequence