**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Online Payment Solutions Inc., )<br><br>Plaintiff )<br><br>-against- )<br><br>Svenska Handelsbanken AB, )<br>Peter Lars Johansson, Nicholas Nolter, )<br>Eric Nolter aka Aryksin Noble, )<br>Factor Europe UK Limited, DOES 1-10, )<br><br>Defendants. ) | Civil Action No. 07 CIV 8692 (PKL)<br><br><br>**DECLARATION OF**<br>**ANTHONY JOHN**<br>**DE GARR ROBINSON QC** |

I, **ANTHONY JOHN DE GARR ROBINSON QC**, of One Essex Court, Middle Temple, London EC4Y 9AR, state as follows:

1.    I am a barrister practising from chambers in London.  I was called to the Bar of England and Wales in 1987 and I was appointed Queen's Counsel in 2006.

2.    I submit this declaration in relation to the defendant Svenska Handelsbanken AB's motion to dismiss the plaintiff's Complaint on the grounds of *forum non conveniens*.

3.    Except where otherwise appears, the matters to which I depose in this declaration are within my own knowledge.  Where matters are not within my own knowledge, the source of my information is shown.

## Qualifications and Experience

4.    As an undergraduate, I read Jurisprudence at Oxford University between 1982 and 1985.  While at Oxford, I held an Open Scholarship at University College and won a Gibbs prize in law.  I was awarded a First Class Honours Degree in 1985.  The same year, I was awarded a Kennedy Scholarship.  This allowed me to spend a postgraduate year at Harvard University as a Special Student at Harvard's Graduate School of Arts and Sciences.  In 1986-7, I returned to England to study for my Bar Finals at the Inns of Court School of Law.   That year, I was awarded a Hardwicke Scholarship and a

Denning Scholarship.  I passed my Bar Finals and was called to the Bar by Lincoln's Inn in 1987.  I have been in private practice since completing my pupillage in 1988.

5.    Between 1988 and 1990, I practised from 9 Old Square (now called Enterprise Chambers) in Lincoln's Inn.  Since 1990, I have practised from One Essex Court, in Middle Temple.  One Essex Court is one of the leading commercial sets of chambers in England.

6.    I was awarded Queen's Counsel in 2006.[1]

7.    Exhibit A to this declaration is my curriculum vitae (this is also currently posted on the One Essex Court website).

8.    I have a litigation practice which covers a broad range of commercial and chancery disputes.  I have considerable experience of fraud, international asset tracing and multi-jurisdictional disputes.  I have acted in or advised on cases involving many different jurisdictions, including Bermuda, the Bahamas, the British Virgin Islands, the Cayman Islands, Jersey, Panama and the United States.  I have been called to the Bar of the Eastern Caribbean Supreme Court (the British Virgin Islands Bar).

9.    In its 2007 edition, Chambers UK (one of the leading guides to the UK legal profession) ranks me in four practice areas (Chancery Commercial, Commercial Litigation, Civil Fraud and Restructuring/Insolvency).  In its Civil Fraud section, it describes me as "one of the true specialists in the field" and, in its Commercial Litigation section, it refers to my "familiarity with international litigation".  The Legal 500 ranks me in Commercial Litigation, Company Law, Civil Fraud and Sport.

10.   I am a member of the Committee of the Chancery Bar Association[2] and I chair its International Relations Sub-Committee.  I am also a member of the Commercial Bar Association.[3]

---

[1] The award of Queen's Counsel (or "QC") is intended to provide a means of identifying excellence in advocacy in the higher courts.  The current process for the award was agreed between the Bar Council and the Law Society and approved by the Lord Chancellor and Secretary of State for Constitutional Affairs in 2004.  It is overseen and directed by an independent selection panel.

## The Subject of This Report

11.  Online Payment Solutions Inc ("**OPS**") has brought proceedings in the Southern District of New York against the following named defendants: (1) Svenska Handelsbanken AB ("**Svenska**"); (2) Peter Lars Johansson ("**Mr Johansson**"); (3) Nicholas Nolter; (4) Eric Nolter; and (5) Factor Europe (UK) Limited ("**Factor Europe**"). The claims in these proceedings are made by OPS as assignee of a company called ECS World ("**ECS**").[4] In some of the claims, it is alleged that Svenska is liable as an accessory of the other named defendants. For convenience, I therefore refer to these other defendants as "**the Primary Defendants**".

12.  I have been asked by White & Case LLP, who act for Svenska, to state my opinion on the adequacy of the English Courts as an alternative forum to determine the claims made in these proceedings. The particular points which I have been asked to consider are set out in paragraph 24 below. A summary of my opinions is contained in paragraph 26.

13.  I have prepared this declaration in order to assist the United States District Court for the Southern District of New York. I regard it as my paramount duty to provide impartial assistance to the court on matters within my expertise. This duty overrides any obligations that I might otherwise owe to any other person. This declaration represents my independent opinion, uninfluenced by the pressures of litigation or objectives of those by whom I have been asked to state my views. In producing it, I have acted as an impartial witness and not as an advocate.

14.  In doing this work, I am remunerated at my usual hourly rate. My remuneration is in no way dependent or contingent upon my opinions.

---

[2] The Chancery Bar Association represents the interests of barristers practising in the field of chancery law (this covers a diversity of areas, including banking, corporate law, financial services, fraud, insolvency law, real property, partnerships and trusts). It is recognised by the Bar Council (the governing body of the English Bar) as a Specialist Bar Association and it is represented on the Bar Council. It operates through a Committee of 18 members, of which I am one.

[3] The Commercial Bar Association represents the interests of barristers who practise in the field of international and commercial law.

[4] From the documents referred to in paragraph 16 below, I understand that ECS's actual name is ECommerce Services UK Ltd.

15.     To the best of my knowledge, I have never acted for Svenska or any parties connected with it. So far as I can recall, I have had no contact with and do not know any of the parties to these proceedings.

### The Claims Made by OPS

16.     I have been provided with the following documents:

(1)     OPS' Complaint.

(2)     Copies of some legal materials to assist me in understanding the essential elements of the claims made by OPS. These materials are:

    (a)     report of *Dangerfield –v- Merrill Lynch 2006 WL 335357 (SDNY)* (in relation to aiding and abetting conversion);

    (b)     report of *Ad Rendon Communications Inc. –v- Lumina Americas Inc. 2007 WL 2962591 (SDNY)* (in relation to conversion);

    (c)     report of *ABF Capital Management –v- Askin Capital Management LP 957 F.Supp 1308* (in relation to fraud and aiding and abetting fraud);

    (d)     report of *Tzaras –v- Evergreen International Spot Trading Inc. 2003 WL 470611 (SDNY)* (in relation to negligence);

    (e)     § 349 New York Uniform Deceptive Trade Practices Act.

(3)     The certificate of incorporation of OPS.

(4)     A UK company search for Factor Europe.

(5)     A UK company search for E Commerce Services UK Limited ("**ECS**").

(6)     A printout from ECS' website, describing its business.

I have read the Complaint and have reviewed the other documents sufficiently to inform my understanding of OPS' claims. I have not seen any of the agreements or other documents referred to in the Complaint.

17.    I have proceeded on the basis that the factual allegations in the Complaint are true or, to the extent that they are conclusory, are allegations that the plaintiff could prove at trial. My understanding of the plaintiff's case, supplemented by the other material described above and certain inferences that I have drawn, is summarised below.

18.    ECS operates a business of providing internet merchants with online payment processing services. It is an English company with a head office in England (its website indicates that this is in London). However, its services are available to merchants all over the world. It processes credit card transactions between merchants and their customers via an intricate payment system that starts with funds being debited from the customers' credit card accounts and culminates in funds being credited to the merchants' accounts.

19.    In July 2004, ECS entered into an agreement ("**the ECS Agreement**") with a Florida corporation called Scandorder Inc., also known as Scandor.com ("**Scandorder**"). It seems that Scandorder agreed to provide a payment processing service to expedite credit card transactions for ECS' merchant clients. This service was based on a merchant account relationship which Scandorder and/or its associates had with Svenska, a Visa- and Mastercard-approved acquiring bank. This merchant account relationship was governed by an agreement which Scandorder and/or a company called Scandinavian Net Logistic ("**SNL**") had made with Svenska the previous month, in June 2004 ("**the Svenska Agreement**").

20.    Pursuant to these two agreements:

    (1)    when a customer making a credit card purchase from an ECS merchant provided its Visa or Mastercard payment details/instructions to the merchant, the details/instructions would be passed on to Svenska;

    (2)    Svenska would then pass them on to Visa or Mastercard, as appropriate;

    (3)    on Svenska's instructions, Visa/Mastercard would credit the relevant funds to an account in Factor Europe's name that was maintained with Svenska in London; and

(4)    these funds should then have been transferred from Factor Europe's account to an account that ECS maintained with Lloyd's TSB, presumably also in London.

21.    In fact, no funds ever reached ECS. Between August 2004 and July 2005, the Factor Europe account received over $6 million dollars. However, despite repeated demands for payment by ECS, these funds have disappeared.

22.    On these alleged facts, it would seem that Scandorder has committed serious breaches of the ECS Agreement. However, no claim is made against Scandorder for breach of this agreement. Claims are made against the Primary Defendants (the individuals who set up and controlled Scandorder and Factor Europe plus Factor Europe itself) and claims are also made against Svenska. ECS has assigned its claims to OPS, which is therefore the claimant.

23.    In the Complaint, OPS claims that:

(1)    the Primary Defendants converted ECS' funds and perpetrated a fraud on ECS;[5]

(2)    Svenska knowingly aided and abetted the Primary Defendants' conversion and their fraud;

(3)    Svenska owed ECS a duty to use due care in opening and monitoring Scandorder's and/or SNL's merchant account and negligently allowed that account to be opened and operated; and

(4)    all the defendants have engaged in deceptive trade practices under the New York Uniform Deceptive Trade Practices Act.

---

[5] The conversion claim is made on the basis that the relevant funds belonged to, and the relevant loss was suffered by, ECS. However, elsewhere in the Complaint, it is alleged that the funds belonged to, and that the loss was suffered by, ECS' merchants. At one point, it is said that ECS's claims "include" the specific claims of Menzia. For the purposes of this declaration, I have disregarded these other potential claims.

### Request for Opinion

24.   Against this background, my opinion has been sought on the adequacy of the English courts as an alternative forum to determine these claims.  In particular, I have been asked to deal with the following matters:

   (1)   The suitability of the English court system to adjudicate on claims such as these, addressing (i) the speed, efficiency and probity of the English courts, (ii) the availability of discovery and appellate procedures, (iii) their ability to deal with commercial and fraud-related litigation, (iv) the length of time it would take to resolve a case like this, (v) whether cooperation can be obtained from the Swedish court and (vi) whether the English court can apply foreign law.

   (2)   The causes of action that would be available in England by which OPS might bring claims.

   (3)   Whether the English court can and would exercise jurisdiction over the defendants and the basis for doing so, assuming that Svenska accepts service of process in England.

25.   I have also been asked to attach my CV and state my familiarity with English courts and with fraud/conversion based claims.   As to these points, my CV is attached as Exhibit A and my experience is summarised in paragraphs 4 to 10 above.  I am a barrister with a commercial/chancery litigation practice.  I have 20 years experience of litigation before the English courts.  It is fair to say that civil fraud is one of my main specialisms.

### Summary

26.   In summary, my views are as follows:

   (1)   The English High Court would be a suitable forum for OPS' claims.  Within the High Court, two courts – the Chancery Division and the Commercial Court – often deal with claims of this sort.  These courts would be able to adjudicate the claims efficiently and expeditiously, with the benefit of discovery and (if appropriate) foreign law evidence.  The claims would be tried before High

Court judges, whose probity and independence are unquestioned and whose judgments are subject to potential appeal. If proceedings were issued tomorrow, and if there were no major procedural delays, I would expect the trial to have started by the spring of 2009.

(2)    On the facts alleged by OPS, there would be no shortage of English causes of action available to OPS against all the defendants, although these would not correspond directly with the causes of action that OPS has pleaded in New York. If Svenska did not knowingly participate in the Primary Defendants' wrongdoing, it might be difficult to fix it with liability.

(3)    The English court could exercise jurisdiction over all the defendants. On the information available, I have no doubt that it would do so in this case.

## A.    The English Court System

### (1)    Commercial and fraud-related litigation

27.    If proceedings of this sort were brought in England, they would be brought in the High Court and would be tried by a High Court judge, sitting without a jury.

28.    The High Court is part of the Supreme Court of England and Wales and is divided into divisions. One of those divisions is the Chancery Division; another is the Queen's Bench Division. The Queen's Bench Divisions includes a specialist court called the Commercial Court, which was specifically set up to handle commercial claims.[6]

29.    Both the Chancery Division and the Commercial Court frequently deal with complex commercial disputes, both national and international. Disputes in the Commercial Court are predominantly international: in about 80% of the cases before that court, at least one claimant or defendant is from outside the jurisdiction.[7] Both the Chancery

---

[6] These are defined in Part 58.1 of the Civil Procedure Rules as "any claim arising out of the transaction of trade and commerce and includes any claim relating to (a) a business document or contract; (b) the export or import of goods; (c) the carriage of goods by land, sea, air or pipeline; (d) the exploitation of oil and gas reserves or other natural resources; (e) insurance and re-insurance; (f) banking and financial services; (g) the operation of markets and exchanges; (h) the purchase and sale of commodities; (i) the construction of ships; (j) business agency; and (k) arbitration."

[7] See the Judicial Communications Office's News Releases dated 3rd April 2006 and 10th May 2007.

Division and the Commercial Court are well used to handling substantial fraud claims, as well as claims that are wholly or partly governed by a foreign system (or systems) of law.

30.  By the standards of these two Courts, OPS' claims are relatively straightforward. They would not be considered particularly large.

31.  Proceedings in the High Court are governed by the Civil Procedure Rules (or "**CPR**") and a series of supplementary Practice Directions.  Proceedings in the Chancery Division and the Commercial Court are also governed by guidance documents (The Chancery Guide and The Commercial Court Guide).

**(2)    Speed and Efficiency**

32.  In recent years, there has been considerable emphasis in England on the need to ensure efficiency and expedition in civil proceedings.  In 1997, a new procedural code was put in place governing such proceedings (the CPR).  The first rule of the CPR provides as follows:

> **"The overriding objective**
>
> 1.1    (1)    These Rules are a new procedural code with the overriding objective of enabling the court to deal with cases justly.
>
> (2)    Dealing with a case justly includes, so far as is practicable –
>
> (a)    ensuring that the parties are on an equal footing;
> (b)    saving expense;
> (c)    dealing with the case in ways which are proportionate –
> (i)  to the amount of money involved;
> (ii) to the importance of the case;
> (iii) to the complexity of the issues; and
> (iv) to the financial position of each party;
> (d)    ensuring that it is dealt with expeditiously and fairly; and
> (e)    allotting to it an appropriate share of the court's resources, while taking into account the need to allot resources to other cases.
>
> **Application by the court of the overriding objective**
>
> 1.2    The court must seek to give effect to the overriding objective when it –
>
> (a)    exercises any power given to it by the Rules; or
> (b)    interprets any rule,
>
> subject to rule 76.2.

**Duty of the parties**

1.3    The parties are required to help the court to further the overriding objective.

**Court's duty to manage cases**

1.4    (1)    The court must further the overriding objective by actively managing cases.

(2)    Active case management includes –

(a)    encouraging the parties to co-operate with each other in the conduct of the proceedings;

(b)    identifying the issues at an early stage;

(c)    deciding promptly which issues need full investigation and trial and accordingly disposing summarily of the others;

(d)    deciding the order in which issues are to be resolved;

(e)    encouraging the parties to use an alternative dispute resolution procedure if the court considers that appropriate and facilitating the use of such procedure;

(f)    helping the parties to settle the whole or part of the case;

(g)    fixing timetables or otherwise controlling the progress of the case;

(h)    considering whether the likely benefits of taking a particular step justify the cost of taking it;

(i)    dealing with as many aspects of the case as it can on the same occasion;

(j)    dealing with the case without the parties needing to attend at court;

(k)    making use of technology; and

(l)    giving directions to ensure that the trial of a case proceeds quickly and efficiently."

33.    Saving costs, proportionality and expedition are explicitly included as aims which the court is required actively to further.

34.    As in many jurisdictions, the costs of litigating in the High Court can be considerable. However, pre-trial depositions and, at the trial itself, lengthy examination in chief are usually unnecessary.[8]

35.    In England, the Court has long had the power to order parties to pay other parties' litigation costs. Traditionally, it has exercised those powers so as to require the loser to pay a significant portion of the winner's costs at the end of the case, following a formal assessment of the reasonableness of those costs by the court. Nowadays, the

---

[8] The exchange of witness statements are now a standard feature of commercial litigation, usually following disclosure and preceding the exchange of expert reports. They ensure that the parties have advance notice of their opponents' evidence, so as to promote settlement and avoid surprise. Unless the court otherwise orders, a witness statement will stand as the evidence in chief of the relevant witness (CPR 32.5(2)). However, the court retains a discretion to order that the witness's evidence, or part of it, should be given orally. It is not uncommon to see this discretion exercised in fraud cases.

court is encouraged to make interim costs orders (which are required to be paid while the case is still proceeding), summary costs orders (orders where the judge assesses the successful party's costs summarily) and split costs orders (orders designed to reflect particular issues on which particular parties have won and lost). The result is that parties have a real incentive not to make unnecessary applications, not to resist proper applications and, more generally, not to run bad arguments.

36.    Whilst the CPR have not achieved all that was hoped for them, in the period since their introduction, cases have undoubtedly speeded up. I recently asked my clerks to enquire of the Chancery and Commercial Court Listing Offices when an eight week trial[9] would be listed for trial if the relevant proceedings were issued now. They inform me that, in the Commercial Court, the trial would probably be listed to commence in January 2009 and that, in the Chancery Division, it would be probably listed for February 2009. In a trial of this length, one would expect the judge to take some time to write his judgment, after the trial has finished. A delay of a few weeks or months would be unexceptionable. A delay of more than a few months would be rare.

### (3)    Probity

37.    English judges have been said to rank highly on any independent scale of objectivity.[10] One of the reasons for this is that appointment to the position of a High Court judge is a considered a singular honour that is afforded only to senior practitioners who have distinguished themselves in long legal careers. Serious misconduct by High Court judges is unheard of.[11] They can only be removed from office following an address by both Houses of Parliament. No High Court judge has ever been removed.[12]

---

[9] Eight weeks was chosen for indicative purposes only. It is not a time estimate for this case. I have no way of knowing how long it would take to try OPS' claims. For example, I do not know how many witnesses are likely to be called or how voluminous the documents are likely to be.

[10] See Walker & Walker's *English Legal System* (9th ed., 2005) by Richard Ward and Amanda Wragg, at p314, citing Robert Stevens' *The English Judges: Their Role in the Changing Constitution* (2002) at p82.

[11] Walker & Walker, ibid, at p320.

[12] See Walker & Walker, ibid, at p319. Pursuant to the Constitutional Reform Act 2005, changes are currently being made to the organisation of the judiciary and to their appointment and discipline. These changes are not intended to affect the high regard in which High Court judges are held.

38.    In England, the highest possible standards are expected of judges.  This expectation is reflected in the principles that are applied when determining whether they should recuse themselves for apparent bias.  These were considered by the Court of Appeal in *AWG Group Ltd v Morrison* [2006] EWCA Civ 6; [2006] All ER 967.  In that case, a judge (Evans-Lombe J) was due to try a takeover dispute.  When reading into the case, he discovered that one of the claimants' witnesses was a friend of his.  He immediately alerted the parties.  The defendants asked him to recuse himself, which would have meant an adjournment of the trial.  The claimants indicated that they would call witnesses instead of the judge's friend.  On this basis, and in the interest of saving the trial date, the judge dismissed the application.  However, this decision was overturned by the Court of Appeal.  Mummery LJ said:

> "[4] As Mr Marshall made clear, his client's sole objection to Evans-Lombe J trying the case was the real possibility of apparent bias.  There was not, it should be emphasised, any suggestion of actual bias or personal interest.  The judge had no personal interest, pecuniary or otherwise, in the outcome of the litigation.  In no sense would he be a judge in his own cause.  The detailed objections … were based entirely on an apprehension of the real possibility of apparent bias.

> [5] Upholding the bias objection on the eve of the trial would cause considerable disruption: the trial would have to be adjourned, as there would be practical problems in finding a new trial judge at such short notice; the parties would suffer additional costs resulting from the adjournment; and there would be delay in fixing a new trial date.

> [6] Inconvenience, costs and delay do not, however, count in a case where the principle of judicial impartiality is properly invoked.  This is because it is the fundamental principle of justice, both at common law and under art 6 of the European Convention for the Protection of Human Rights and Fundamental Freedoms 1950 (as set out in Sch 1 to the Human Rights Act 1998).  If, on an assessment of all the relevant circumstances, the conclusion is that the principle either has been, or will be, breached, the judge is automatically disqualified from hearing the case.  It is not a discretionary case management decision reached by weighing various relevant factors in the balance.

> [7] The test for apparent bias now settled by a line of recent decisions of this court and of the House of Lords is that, having ascertained all the circumstances bearing on the suggestion that the judge was (or would be) biased, the court must ask 'whether those circumstances would lead a fair-minded and informed observer to conclude that there was a real possibility … that the tribunal was biased'.…"

The judge's friend was no longer going to be a witness.  However, he was involved in the events about which other witnesses would be giving evidence.  The Court of

Appeal held that not calling him would not remove the possibility of bias. They therefore directed that arrangements be made to find another judge to try the case.

**(4)    Discovery**

39.    Discovery of documents is a standard feature of High Court proceedings. In the CPR, this process is called disclosure. It is governed by CPR Part 31. The basic principles are summarised below.

40.    Where there are factual disputes, the parties will be ordered to give disclosure of documents within their control which are relevant to those disputes. The overriding principle is that disclosure is restricted to what is necessary and proportionate in the individual case.

41.    Normally, standard disclosure is ordered (CPR 31.5). Essentially, this requires each party to disclose (a) the documents on which he relies, (b) the documents which adversely affect his own or another party's case and (c) the documents which support another party's case (CPR 31.6).[13] It also requires him to make a reasonable search for such documents (CPR 31.7). It is intended to reflect, and give effect to, the principle of proportionality referred to in CPR 1.1(2)(c) (see paragraph 32 above).

42.    The CPR recognise that there are cases where standard disclosure would be inadequate. In such cases, the court has the power to order wider disclosure, tailored to meet the needs of each case. It can order the disclosure of specific documents or classes of documents and it can order searches of a specific extent to be carried out (CR 31.12). In particular, it can order the disclosure of all documents which is reasonable to suppose may contain information which may lead to a train of enquiry which may enable the other party to advance his own case or to damage the case of the disclosing party (Part 31 Practice Direction, paragraph 5.5). The exercise of this power is in the discretion of the court. In practice, it is exercised only in a minority of

---

[13] It also requires a party to disclose documents which he is required to disclose by a relevant practice direction. For present purposes, this requirement can be ignored

cases. However, one would expect it to be exercised in cases involving fraud, dishonesty or misrepresentation.[14]

43.    The courts try to ensure that disclosure is limited to those categories of documents that it is reasonable to suppose may be relevant. They will not order disclosure of documents which have no apparent relevance. Fishing expeditions are not allowed.

44.    Quite apart from *inter partes* disclosure, the court has the power to order third parties to give disclosure. In particular, it has a statutory power under section 34 of the Supreme Court Act 1981. This power is exercised where (a) the documents sought are likely to (in the sense that they may well) support the case of the applicant or adversely affect the case of one of the other parties to the proceedings and (b) disclosure is necessary in order to dispose fairly of the claim or to save costs (CPR 31.17). This is a power which the court will exercise in an appropriate case. However, the court is generally reluctant to order third parties to disclose wide categories of documents.

45.    The court has other powers to order third party disclosure which are not subject to these requirements (CPR 31.18). For example, it has a jurisdiction to order disclosure against persons who have, whether innocently or not, become mixed up in the wrongful acts of others so as to facilitate their wrongdoing. In addition, it has a jurisdiction to protect and preserve trust funds. Under these jurisdictions, the court can often be persuaded to make relatively wide disclosure orders against third parties (such as banks) where this is necessary to identify and trace fraudsters and the proceeds of their fraud.[15]

(5)    **Appeals**

46.    Appeals from the High Court to the Court of Appeal are governed by CPR Part 52. Generally speaking, permission to appeal is required for all appeals from High Court

---

[14] In the previous edition of the Commercial Court Guide, these cases were identified as examples of cases where one might expect the power to be exercised. They remain good examples: Hollander's *Documentary Evidence* (9th ed., 2006) at paragraph 8.26 and Malek & Matthews *Disclosure* (3rd ed., 2.007) at paragraph 6.56.

[15] Gee's *Commercial Injunctions*, 5th ed., 2004 paragraphs 22.049-056. There is also a statutory jurisdiction to order banks to disclose their records under the Banker's Books Evidence Act 1879 (Gee paragraph 22-044 to 22-046).

judges (CPR 52.3(1)).[16] Thus, permission is needed to appeal from a final judgment following a trial.

47.    Permission to appeal may be sought from the judge and/or from the Court of Appeal (CPR 52.3(2)). It will only be given where the court considers that the appeal would have a real prospect of success or there is some other compelling reason why the appeal should be heard (CPR 52.3(6)). In practice, it is given if the court takes the view that an appeal would have a realistic (as opposed to a fanciful) chance of success. It may be limited to particular issues and may be subjected to conditions. It is not usually given against case management decisions.

48.    An appeal will be allowed (a) when the judge's decision was wrong and (b) when the decision was unjust because of a serious procedural or other irregularity (CPR 52.11(3)).

49.    Appeals are limited to a review of the judge's decision unless a practice direction makes a different provision for a particular category of appeal or the court considers that it would be in the interests of justice to hold a re-hearing or (CPR 52.11(1)). In practice, the difference between a re-hearing and a review can be quite subtle. Whether conducting a re-hearing or a review, the Court of Appeal proceeds on the basis of the evidence already given before the judge. Moreover, it accords appropriate respect to the judge's decision on that evidence. The appropriate degree of respect depends on the nature and circumstances of the case. On questions of law, the Court will not hesitate to interfere if it thinks the judge was wrong. In relation to an exercise of discretion, the Court will interfere only where the judged has made an error of principle in his approach or has left out of account some feature that he should have considered (or *vice versa*), or because the Court is forced to the conclusion that he has not balanced the various factors fairly in the scale. The Court is similarly reluctant to interfere with decisions of primary fact reached after an evaluation of oral evidence. On the other hand, it is willing to interfere where the decision was based upon inferences from the evidence and/or an analysis of the

---

[16] Permission is not required for appeals against a committal order, a refusal to grant *habeus corpus* and a secure accommodation order the Children Act.

contemporaneous documents. The Court will draw any inference which it considers justified (CPR 52.11(4)).

50.    The Court of Appeal will not generally receive fresh evidence (oral or written), but it has the power to order otherwise (CPR 52.11(2)). The circumstances in which it will exercise this power are not prescribed. However, in practice, the most important factors are (a) whether the evidence could with reasonable diligence have been obtained for use at the trial, (b) whether it would probably have an important impact on the result of the case and (c) whether it is apparently credible.

51.    For completeness, I should mention that, in civil matters, an appeal may be brought from the Court of Appeal to the House of Lords, with the leave of the Court of Appeal or the House of Lords.[17] Appeals to the House of Lords are quite rare: leave to appeal will only be given where an arguable point of law of general public importance is raised.[18]

### (6)    Foreign law

52.    Insofar as OPS' claims raised points of foreign law, there would be no difficulty in applying that law in England.[19] In an English court, foreign law is treated as a matter of fact and it is pleaded and proved as such.[20] In general, it is proved by expert evidence.[21] If OPS or any of the defendants were to rely on disputed propositions of foreign law, the court's practice would be to give each of the parties permission to call a foreign law expert, on terms that reports containing the substance of the experts' respective evidence are exchanged between the parties in advance of the trial.[22] In the usual course, the experts would then attend the trial to be cross examined on their reports.

---

[17] Administration of Justice (Appeals) Act 1934, section 1(1).

[18] Practice Directions Applicable to Civil Appeals, paragraph 4.6.

[19] This would be the position, for example, if OPS' claims were as a matter of English private international law governed by foreign law. For tort claims (excluding defamation), the relevant rules of English private International law are contained in Part II of the Private International Law (Miscellaneous Provisions) Act 1995.

[20] *Dicey, Morris & Collins' The Conflict of Laws* (14th ed., 2006), paragraphs 9-001 to 9-012.

[21] *Dicey, Morris & Collins* at paragraph 9-013 to 9-014.

[22] The rules on expert evidence are contained in CPR Part 35. These rules provide that the expert's duty to help the court on matters within his expertise overrides any obligation to the person from whom he has received instructions or by whom he is paid.

### (7)     International Co-Operation

53.     Turning to the question whether co-operation can be obtained from the Swedish Court, the most obvious area for co-operation is the taking of evidence. However, I should also mention the recognition of judgments and the availability of provisional relief.

### (a)     The Taking of Evidence Regulation

54.     Both Sweden and the United Kingdom are parties to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters 1970. However, as between the United Kingdom and all the Member States of the European Union other than Denmark, the Hague Convention has effectively been replaced by European law, namely Council Regulation (EC) No. 1206/2001 on cooperation between courts of Member States in the taking of evidence in civil or commercial matters ("**the Taking of Evidence Regulation**"). Like the United Kingdom, Sweden is a Member State of the European Union and it is subject to this Regulation.

55.     The Taking of Evidence Regulation is based on the Hague Convention. However, there are some significant differences with the Hague Convention, including: (1) the Regulation provides for direct transmission of requests between specified courts, (2) it provides for specific periods within which relevant steps should be taken (for example, the requested court should execute the request within 90 days of receipt of the request, at the latest) and (3) requests may not be refused on the ground that the Member State's sovereignty or security would be prejudiced.

56.     The Regulation covers the taking of evidence which is intended for use in judicial proceedings. As is the case under the Hague Convention,[23] there is no possibility of securing pre trial discovery of documents from third parties. Of course, this is not relevant to Svenska. If Svenska were a defendant to English proceedings, it would be bound to give disclosure in accordance with the principles described above.

57.     The Regulation is to provide a streamlined process pursuant to which the courts of Member States are required to co-operate together on the taking of evidence. My

experience of the Hague Convention is that it is slow and cumbersome. I have no personal experience of the Taking of Evidence Regulation, but it appears to be much quicker and simpler to use than the Hague Convention.

58.    For completeness, I should mention that a party to English proceedings is free to obtain evidence for the proceedings by any lawful means, so long as those means are not unconscionable. This can include seeking direct help from foreign courts. In *South Carolina Insurance Co v Assurantie Maatschappij "De ZevenProvincien" NV* [1987] AC 24, the House of Lords considered whether a party to English proceedings should be prevented from obtaining third party disclosure in the United States pursuant to 28 U.S.C section 1782. It held that section 1782 proceedings are not inherently objectionable.

### (b)    The Judgments Regulation

59.    Sweden and the United Kingdom are also subject to Council Regulation No. 44/2001 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters ("**the Judgments Regulation**"). Like the Taking of Evidence Regulation, this Regulation applies between all the Member States of the European Union, other than Denmark ("**the Regulation States**"). As well as providing a set of rules allocating jurisdiction between Regulation States' courts in civil and commercial matters, it requires the direct recognition and enforcement of judgments in such matters between Member States and it empowers Member States' courts to grant such provisional measures as may be available under their law, notwithstanding that the courts of another Member State has jurisdiction over the underlying claim.

60.    In some English cases, the Judgments Regulation can be very useful. I am not in a position to judge whether this would be such a case.

### B.    English Causes of Action

61.    In the following paragraphs, I consider the principal causes of action that would be available to ECS (and thus OPS, its assignee) under English law based on the

---

[23] Under the Hague Convention, Sweden has declared that it will not execute letters of request issued for the purpose of obtaining pre-trial discovery of documents.

allegations in the Complaint.[24]  For this purpose, I approach the case on the basis that the relevant wrongdoing was governed by English law.  However, if the most significant elements of that wrongdoing occurred in another country, the English courts might apply the law of that country, without regard to English law.[25]

### (1)    Causes of Action Against the Primary Defendants

62.    As against the Primary Defendants, OPS makes two claims for relief: a claim in conversion and a claim under the New York Uniform Trade Practices Act.  However, I note that the Complaint discloses a third potential head of claim: that that the Primary Defendants have committed a fraud on ECS.  This is the basis of OPS' claim against Svenska for aiding and abetting fraud.

63.    OPS' conversion claim is simple.  The claim is that (1) $6,236,372 belonged to ECS, (2) the Primary Defendants initially took possession of these funds ("**the ECS funds**") lawfully, but ECS demanded payment on or about 20 March 2006 and (3) the Primary Defendants refused to return the ECS funds (they have in fact moved them from the Factor Europe account).

64.    Under English law, a claim for conversion would not be available.  Conversion relates to dealings with corporeal personal property (*Clerk & Lindsell on Torts* (19th ed., 2006), paragraph 17-33).  It does not apply to dealings with intangible choses in action (*Clerk & Lindsell* 17-33; *OBG Ltd v Allan* [2007] UKHL 21; [2007] 4 All ER 545 at [94]-[97], [271] and [321]).  Nor does it apply to money, taken and received as currency (*Clerk & Lindsell*, paragraph 17-34; *Lipkin Gorman v Karpnale Ltd* [1991] 2 AC 548 at 559E).  However, the law imposes a restitutionary obligation on the recipient of stolen money to pay an equivalent sum to the victim if the recipient has been unjustly enriched at the expense of the true owner (*Lipkin Gorman*, ibid).[26]

---

[24] To avoid prolonging this declaration unduly, I have not addressed all conceivable causes of action, nor have I considered remedies in any detail.

[25] Under section 11 of the Private International Law (Miscellaneous Provisions) Act 1995, the general rule in tort cases is that the applicable law is of the country in which the events constituting the tort in question occurred. This general rule can be displaced, however.

[26] Change of position is a defence to restitutionary claims founded on unjust enrichment.  The recipient will not be required to give restitution to the extent that he has in good faith changed his position in such a way that he will suffer an injustice if called upon to repay some or all of the amount he has received.

65.    This restitutionary obligation is generally owed to the legal owner of the money (i.e. the party who has title to the chose in action representing the money at common law). According to the Complaint, the money that was credited to the Factor Europe account "belonged" to ECS. I infer that this was the effect of the ECS Agreement.

66.    At common law, it is not possible to trace money which has become mixed with other money before it reaches the defendant recipient. A common law restitutionary might be resisted on this ground. However, whatever the position at common law, the proposition that the relevant credits belonged to ECS in equity would involve no similar difficulty. I imagine that OPS would argue that the ECS funds "belonged to" ECS in the sense that they were held on trust for ECS.[27]

67.    On this basis, trust funds amounting to $6,236,372 have allegedly been paid away in breach of trust. On the facts alleged in the Complaint, OPS would as ECS' assignee pursue the following remedies in equity:

    (1)    To the extent that any of the ECS funds or their traceable proceeds[28] remain in the hands of the any of the Primary Defendants, ECS (and now OPS) could reclaim its property from them.[29]

    (2)    Quite apart from OPS' proprietary claims:

        (a)    If Factor Europe in some way accepted or assumed a position as a trustee of the ECS funds, it would be liable as trustee to put ECS (and now OPS) in the position it would have been in had there been no breach of trust.

        (b)    If, on the other hand, Factor Europe did not voluntarily assume the position of a trustee, it could nevertheless be said to have received the

---

[27] A resulting or constructive trust could also arise if the entire transaction was a fraud on ECS and ECS rescinded it: *Snell's Equity* (31st ed., 2005), paragraphs 24-08.

[28] i.e. any other assets that have been acquired using, or can otherwise be identified with, the ECS funds.

[29] Although it does not arise on the facts alleged by OPS, I should make it clear that proprietary claims of this sort are subject to the *bona fide* purchaser defence. Under this defence, a defendant who proves that he purchased a legal interest in the relevant property in good faith, for value and without notice of the claimant's equitable interest will be permitted to retain the property. Also, as noted above, the change of position has been recognised as a defence to restitutionary claims founded on unjust enrichment. The availability of this defence in trust-based tracing claims is uncertain, but I do not need to explore this here since the defence is not available to a wrongdoer (see *Snell's Equity* (31st ed., 2005), paragraphs 28-41 to 28-44, esp 28-44).

ECS funds with knowledge of circumstances making it unconscionable for it to retain them for itself. It could therefore be liable as a constructive trustee to give restitution of the amounts it received, on the basis of what is usually called knowing receipt.[30] It would make no difference that Factor Europe no longer has these amounts.

(c)    By the same token, to the extent that any part of the ECS funds has been received by or on behalf of any of the other Primary Defendants, ECS could be entitled to reclaim the relevant amounts from them as constructive trustees. Again, it would make no difference that they no longer had these amounts.

68.    In addition to these restitutionary-type liabilities, on the facts alleged in the Complaint some or all of the Primary Defendants could be liable in equity for having dishonestly assisted a breach of trust:[31]

(1)    As explained above, it would appear to be OPS' case that a breach of trust has been committed by the trustee of the ECS funds. On the facts alleged in the Complaint, that breach has been assisted (i.e. induced, procured and/or helped) by at least some of the Primary Defendants.

(2)    A person who dishonestly assists a trustee in committing a breach of trust is liable as if it were a constructive trustee to compensate the trust for losses resulting from his assistance.

69.    Quite apart from these heads of liability, on the facts alleged in the Complaint, OPS could plead claims for a variety of English law torts, including deceit, unlawful interference and conspiracy.[32] It might also be able to plead a claim for the tort of

---

[30] *Snell's Equity*, paragraph 28-46; *Bowstead & Reynolds on Agency* (18trh ed., 2006) at 9-131 and 133 to 136. There is scope for argument as to the precise test for liability for knowing receipt. It has been suggested that dishonesty is required. However, the better view is that the more flexible test of "unconscionability" should be applied. Different approaches are appropriate for different situations. Where the recipient receives the funds in a ministerial capacity, for example as the lawfully appointed agent of the trustee, and he pays the funds away on the instructions of the trustee, he will generally only be liable if he acted dishonesty.

[31] *Snell*, paragraph 28-46 (the section dealing with the test for dishonesty requires correction in the light of *Barlow Clowes*, cited below); *Bowstead & Reynolds*, paragraphs 131 to 132.

[32] In view of the approach adopted in the Complaint, I have not been able separately to analyse the liability of each Primary Defendant. However, given that the Complaints clearly proceeds on the basis that all the Primary Defendants actively participated in a common design, it is unnecessary for me to do so in this declaration.

inducing/procuring breach of contract; however, OPS has not pleaded any breach of the ECS Agreement and, as OPS has ample English law tort claims in any event, I have disregarded this aspect.

70.     The basic elements of deceit, unlawful interference and conspiracy are summarised below:

### (a)     Deceit

Where a defendant makes a false representation, knowing it to be untrue or being reckless as to whether it is true, and intends that the claimant should act in reliance on it, then insofar as the claimant suffers loss as a result, the defendant is liable for deceit (*Clerk & Lindsell*, paragraph 18-01).

### (b)     Unlawful interference

It is a tort to cause a claimant loss by unlawful interference with the actions of a third party with an intention thereby to cause loss to the claimant. This tort has very recently been reviewed by the House of Lords in *OBG Ltd v Allan* [2007] UKHL 21 at [47].[33] Acts against a third party count as unlawful interference if they are actionable by that third party or they would be actionable if the third party had suffered loss as a result (*OBG Ltd v Allan* at [49]). Examples of such acts would include telling lies to the third party or bribing the third party's employees.

### (c)     Conspiracy

A conspiracy consists in an agreement or combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means, with the intention of injuring the claimant (*Clerk & Lindsell* paragraph 25-116).[34] A clear agreement between the conspirators is not required. Any combination, understanding or concert involving two or more persons can be sufficient (*Clerk*

---

[33] In that case, there were differences in view between Lord Hoffman and Lord Nicholls. The majority of the House agreed with Lord Hoffman's analysis and so the paragraphs cited in this declaration are paragraphs in Lord Hoffman's speech.

[34] For completeness, I should mention that there can be an actionable "conspiracy to injure", which does not require unlawful means. This second form of conspiracy is relatively rare. It requires a predominant purpose to injure (so-called "targeted malice") and it is not relevant here.

& *Lindsell* 25-118 to 120). The cause of action for conspiracy is not complete unless the conspirators do acts pursuant to their agreement/combination which damage the claimant.

**(2)    Causes of Action Against Svenska**

71.    As against Svenska, OPS makes four claims for relief: aiding and abetting conversion, aiding and abetting fraud, negligence and the Uniform Deceptive Trade Practices Act.

72.    On the facts alleged in the Complaint, an English law claim could be made against Svenska for dishonest assistance.[35]  Moreover, Svenska could face claims (1) as a joint tortfeasor[36] with the Primary Defendants' for their deceit of ECS[37] and for part of their unlawful interference[38] and (2) as a co-conspirator with the Primary Defendants.[39]  For that matter, so could Svenska's employees.

73.    In England, the bribery of an agent is treated as a fraud on the principal. If Svenska's employees were acting in fraud of Svenska, it could be a matter of contention whether their knowledge of the fraud should be imputed to Svenska.  However, Svenska could be vicariously liable for the acts of its employees acting in the course of their employment.  In relation to these acts, no separate question of imputing knowledge would therefore arise.

74.    If Svenska did not know that it was assisting the Primary Defendants in their alleged wrongdoing, the next question would be whether it would in any event be liable for negligence.  In English law, there is no general liability in tort for careless words or acts. A duty of care is needed.  The courts are cautions about imposing such a duty in relation to purely economic loss.  Cardozo J's dictum regarding the risk of liability in an

---

[35] For the principles applicable to this liability, see paragraphs 67 and 68 above.

[36] Where a defendant's own actions are not sufficient to make him separately liable in tort, he may still be liable for playing a part in the torts perpetrated by others. To be liable, the defendant must either have (1) procured or induced the "primary" defendant's commission of the tort or (2) joined in a common design pursuant to which the tort was committed. If he did these things intentionally, he would be jointly and severally liable with the principal wrongdoers as their accessory (*Credit Lyonnais v ECGD* [1998] 1 Lloyd's Rep 19 at 46).

[37] For the principles applicable to this liability, see paragraph 70(a) above.

[38] The part in which they deceived Visa/Mastercard: Svenska surely cannot be liable for the bribery of its own employees.  For the principles applicable to this liability, see paragraph 70(b) above.

[39] For the principles applicable to this liability, see paragraph 70(c) above.

indeterminate amount for an indeterminate time to an indeterminate class is frequently cited in English cases.

75. The law governing the circumstances in which a duty of care will be held to have arisen is a large subject. In relation to economic loss, three approaches tend to be applied by the English courts (*Clerk & Lindsell* paragraph 8-90): the incremental approach (comparing/drawing analogies with fact situations in which it has already been decided that a duty of care exists: *Clerk & Lindsell* paragraph 8-23); the three stage test (determining whether it is fair, just and reasonable that the law should impose a duty of care: *Clerk & Lindsell* paragraphs 8-15 and 89) and the assumption of responsibility test (looking for a special relationship between the parties under which the defendant can, on an objective basis, be said to have assumed or undertaken a responsibility to the claimant: *Clerk & Lindsell* paragraphs 8-87 to 88).

76. Whether Svenska owed ECS a duty of care under English law would be a matter of contention. On the facts alleged in the Complaint, OPS could argue that Svenska owed (and breached) a duty of care to ECS. On the other hand, Svenska could argue that such a duty should not be imposed in this situation.

**C.    The English Court's Jurisdiction**

77. Turning to the English court's jurisdiction to entertain OPS' claims, in England the service of process is the foundation of the Court's jurisdiction to entertain a claim *in personam*. When process cannot legally be served on a defendant, the court has no jurisdiction over him.[40]

78. The rules relating to service are contained in CPR Part 6, as supplemented by the Judgments Regulation and the Brussels and Lugano Conventions on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters ("**the Conventions**"). The Judgments Regulation is relevant, since Factor Europe and Svenska are each domiciled in a Regulation State (the United Kingdom and, I imagine, Sweden).[41] The Judgment Regulation applies to civil and commercial matters, which would include OPS' claim.

---

[40] *Dicey, Morris and Collins*, paragraph 11-003.
[41] *Dicey, Morris and Collins*, paragraphs 11R-072 and 083 to 084.

79.     Under the Judgments Regulation, the general rule is that persons domiciled in a Regulation State shall, whatever their nationality, be sued in the courts of that Regulation State (Article 2(1)). There is a variety of permissive exceptions to this mandatory rule, allowing a person domiciled in one Regulation State to be sued in another Regulation State. Examples of the cases in which this is permitted include:

(1)     In matters relating to tort, delict or quasi-delict, the person may be sued in the courts for the place where the harmful event occurred or may occur (Article 5(3)).

(2)     As regards a dispute arising out of the operations of a branch, agency or other establishment, he may be sued in the courts for the place in which the branch etc is situated (Article 5(5)).

(3)     Where he is one of a number of defendants, he may be sued in the courts for the place where any of them is domiciled, provided the claims are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate questions (Article 6(1)).

80.     In the present case, Factor Europe is an English company and OPS would be entitled to sue it in England as of right. Other things being equal, it would also be entitled to sue Svenska here on one or more of the grounds set out above. However other things are not equal. I am asked to assume that Svenska would accept service of process in England. A person can always submit to the jurisdiction in this way.[42] This is reflected in Article 24 of the Judgments Regulation, which provides that a court of a Regulation State before which a defendant enters an appearance shall have jurisdiction. Thus, under the Judgments Regulation, the English court would have power to determine OPS' claims against Factor Europe and Svenska.

81.     Pursuant to CPR 6.19, process may be served on a defendant out of the jurisdiction where (1) the claims made are claims which the court has power to determine under the Judgments Regulation, (2) no proceedings between the parties concerning the same claim are pending in the courts of any other part of the United Kingdom or any

---

[42] *Dicey, Morris and Collins*, paragraphs 11R-129 and 132.

other Regulation State and (3) the defendant is domiciled in the United Kingdom or any other Regulation State. As I explain in paragraph 80 above, under the Judgments Regulation, the court would have the power to determine OPS' claims against Factor Europe and Svenska. Accordingly, OPS is entitled to sue both these defendants as of right. The English court would have no discretion in the matter and its permission would not be needed.

82.     This leaves three other defendants, namely Mr Johannsson, Nicholas Nolter and Eric Nolter. In the Complaint, Mr Johannsson is said to be resident in Sweden. This means that he is likely to be domiciled in Sweden for the purposes of the Judgments Regulation.[43] If that is the case, OPS would be entitled as of right to join him as a defendant to its claim against Factor Europe and Svenska, as explained in paragraphs 79 to 81 above. If it is not the case, he would fall to be treated in the same way as Nicholas and Eric Nolter, as explained in paragraphs 83 to 90 below.

83.     In the Complaint, the Nolters are said to be resident in Florida. As they are not domiciled in a Regulation State, the Judgment Regulation (and thus CPR 6.19) has no application to them. Instead, CPR 6.20 applies. This provides that, in any proceedings to which CPR 6.19 does not apply, the court may give permission to serve proceedings out of the jurisdiction on specified grounds. These include where:

(1)     A claim is made against someone on whom proceedings have been or will be served (other than in reliance on this ground) and

    (a)     there is between the claimant and that person a real issue which it is reasonable for the court to try and

    (b)     the claimant wishes to serve the claim for on another person who is a necessary or proper party to that claim (rule 6.20(3)).

---

[43] Under Article 59 of the Judgments Regulation, if a party is not domiciled in the Regulation State whose courts are seised of the matter then, in order to determine whether he is domiciled in another Regulation State, the court shall apply the law of that other Regulation State. I am not qualified to opine on the Swedish law of domicile, but it is well known that, on mainland Europe, the concept of domicile does not require a person's domicile to be his permanent home. For persons domiciled in the United Kingdom, the United Kingdom had to adopt a special definition of the term to bring it into line with the European concept: under that definition, a party is domiciled here if he is resident in the United Kingdom and the nature and circumstances of his residence indicate that he has a substantial connection with the United Kingdom. See *Dicey, Morris and Collins*, paragraph 11R-72 and 075-079.

(2)    A claim is made in tort where

    (a)    damage was sustained in the jurisdiction or

    (b)    the damage sustained resulted from an act committed within the jurisdiction (rule 6.20(8)).

(3)    The whole subject matter of a claim relates to property within the jurisdiction (rule 6.20(10)).

(4)    A claim is made for any remedy which might be obtained in proceedings to execute the trust of a written instrument where

    (a)    the trusts ought to be executed according to English law and

    (b)    the person on whom the claim form is to be served is a trustee of the trusts (rule 6.20(11)).

(5)    A claim is made for a remedy against the defendant as constructive trustee where the defendants alleged liability arises out of acts committed within the jurisdiction (rule 6.20(14)).

(6)    A claim is made for restitution where the defendant's alleged liability arises out of acts committed within the jurisdiction (rule 6.20(15)).

84.    I am not in a position to determine whether and to what extent all these grounds would apply to Nicholas and Eric Nolter. For example, I do not know whether the trust of the ECS funds were contained in a written instrument and nor do I know where all the acts resulting in damage/liability were committed. Given that the Factor Europe account from which the ECS funds were stolen was a London account and that the ECS account into which the ECS funds should have been paid was probably also a London account, it seems reasonable to infer that ECS' damage was suffered here and that substantial acts were committed here. If that were the case, OPS' claim against the Nolters would be likely to fall within rules 6.20(8), (14) and (15). However, it is not necessary to pursue these points because the claim would certainly fall within rule 6.20(3).

85.     The purpose of rule 6.20(3) is to avoid multiplicity of proceedings. Where the court has jurisdiction to entertain a claim against one person and it would be appropriate to hear that claim together with a claim that against an additional person (or persons), the rule allows the court to entertain both claims together. This does not merely apply where the additional defendant has a jointly or several liability with the original defendant: it applies in all cases where the ordinary rules on joinder of parties would allow the defendant to be joined to the proceedings.[44] The paradigm example for the application of the rule is where the liability of all the defendants depends upon one investigation.

86.     The courts will only apply the rule where the initial claim is a bona fide claim which raises real issues. Moreover, as with all the other grounds in CPR 6.20, under the rule the court has a discretion whether to give permission to serve the proceedings on the proposed defendant out of the jurisdiction. In this respect, the rule differs substantially from rule 6.19 (see paragraph 81 above). The courts will not give permission to serve out where the original claim is a spurious claim which has been brought merely for the purpose of establishing jurisdiction. However, if it is a bona fide claim which raise real issues, they will often give permission. One frequently sees cases where large numbers of foreign defendants have been included pursuant to this rule.[45]

87.     The applicant for permission to serve out must show a serious issue to be tried between himself and his proposed foreign defendant. Having done that, he must satisfy the court that it is clearly the appropriate forum for the claim, i.e. that it is the forum where the case may most suitably be tried for the interests of all the parties and the ends of justice.[46] For this purpose:

(1)     The court will consider what is the "natural forum", i.e. the forum with which the proceedings have the most real and substantial connection. This involves

---

[44] See, for example, CPR 19(2), which permit a person to be added as a new party to existing proceedings if (a) it is desirable so that the court can resolve all matters in dispute in the proceedings or (b) there is an issue involving the new party and an existing party which is connected to the matters in dispute in the proceedings and it is desirable to add the new party so that the court can resolve that issue.

[45] See, generally, the notes to CPR 6.20(3) at 6.21.27-29 of the White Book. See also *Dicey, Morris and Collins*, paragraphs 11-165R to 170.

[46] For the *forum conveniens* principles applied in England, see the White Book notes at 6.21.15-6.21.18.

not only factors of convenience and expense (e.g. the availability of witnesses) but also factors such as governing law.

(2)    The court will generally disregard general procedural advantages in England (e.g. the availability of compound interest).

(3)    If the court considers that there is another forum which apparently as suitable or more suitable than England, it will normally refuse permission to serve out unless there are circumstances by reason of which justice requires that permission be granted.

88.    In this case, it would be extremely difficult to persuade the court that there is another forum which is as suitable or more suitable than England. Relevant factors include:

(1)    Although they have been brought by an assignee, the claims made in this case are the claims of an English company (ECS).

(2)    The theft upon which the case is based was entirely English. The money that was stolen belonged to an English company (ECS). It is alleged that the money was stolen by an English company (Factor Europe) and from an English bank account (Factor Europe's account at Svenska's London branch). As noted above, I infer that it should have been paid into ECS' English bank account.

In these circumstances, one would expect the claims arising from the theft either to be governed by English law or at least to include some significant English legal issues (e.g. who owned the money, what was the nature of its title, etc).

(3)    The theft was made possible because of a fraud that was practised upon ECS. In paragraph 65 of the Complaint, it is said that the ECS was induced to enter into the ECS Agreement by representations that were made through Walid El Houri in Florida. However, the form in which the representations were made is not clear. Nor is it clear where they were received, or relied upon, by ECS. ECS may well have been deceived in England, which is where its head office is and where it should have received its money. In this regard, I note that the

London police (Scotland Yard) is said to be investigating the defendants (paragraph 37 of the Complaint).

89.    If OPS commenced its proceedings in London, the position would be as follows.  As against Factor Europe, Svenska and (assuming he is domiciled in Sweden) Mr Johannsson, the English court would be bound to accept jurisdiction.  Against those defendants, it would have no discretion to stay the proceedings on *forum conveniens* grounds, even where the rival forum is in a non-Regulation State.[47]  Against the Nolters, the English court would have a discretion to stay the proceedings on *forum conveniens* grounds.  However, on the limited information available, it is difficult to think of a forum which is as, or more, appropriate than England.

90.    In any event, I have no doubt that an English court would take the view that justice required OPS' claims against the Nolters to be tried at the same time as OPS' claims against Factor Europe, Svenska and Mr Johansson.  Given that those claims would have to be tried in England in any event, this would mean that all the claims would be tried in England.

91.    In summary, my view is that the English could and would exercise jurisdiction over all the defendants in this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate.

Executed on ___11___ December 2007 in London, England

Anthony de Garr Robinson QC

---

[47] *Dicey, Morris and Collins*, paragraphs 12-013 to 12-020 and *Owusu v Jackson* [2205] QB 801.