# Exhibit

# A

1   Marc Rowin (S.B.N. 1039239)
    LYNCH ROWIN LLP
2   630 Third Avenue
    New York, New York 10017
3   Telephone: 212-682-4001
    Fax: 212-682-4003
4   Email: mrowin@lynchrowin.com

5
    David Paul Steiner (S.B.N. 64638)
6   DAVID STEINER & ASSOCIATES
    A Professional Corporation
7   1925 Century Park East, Suite 2350
    Los Angeles, CA 90067-6019
8   Telephone No.: (310) 557-8422
    Facsimile No.: (310) 274-8643
9   Cell Phone No.: (310) 556-0336
    E-Mail: dpsartnetlaw@earthlink.net
10
    Attorneys for Plaintiff
11  ONLINE PAYMENT SOLUTIONS INC.,

12

    **UNITED STATES DISTRICT COURT**
13  **SOUTHERN DISTRICT OF NEW YORK**

14

15

16  ONLINE PAYMENT SOLUTIONS INC.,    ) Case No.:
    a New York corporation.           )
17                                    )
                          Plaintiff,  ) **COMPLAINT FOR:**
18        - against -                 )
                                      ) 1.    CONVERSION
19  SVENSKA HANDELSBANKEN A.B., a     ) 2.    AIDING & ABETTING
    Swedish public company; PETER LARS) CONVERSION
20  JOHANSSON, an individual; NICHOLAS) 3.    AIDING & ABETTING
    NOLTER, an individual; ERIC NOLTER) FRAUD
21  *aka* ARYKSIN NOBLE, an individual;) 4.    NEGLIGENCE
    FACTOR EUROPE UK LIMITED, a       ) 5.    NEW YORK UNIFORM
22  United Kingdom limited liability company,) DECEPTIVE TRADE
    and DOES 1-10,                    ) PRACTICES ACT (NY CLS
23                                    ) GEN BUS § 349)
                          Defendants. )
24                                    ) **DEMAND FOR JURY TRIAL**

25

26   ─────────────────────────────

27

28                          COMPLAINT                                    1

**07 CIV 8692**

FILED
U.S. DISTRICT COURT
S.D. N.Y.
2007 OCT -9 AM 11:14

Plaintiff ONLINE PAYMENT SOLUTIONS INC., ("OPS") by and through their undersigned counsel, brings this action against Defendants SVENSKA HANDELSBANKEN A.B. ("HANDELSBANKEN"), PETER LARS JOHANSSON ("JOHANSSON"); NICHOLAS NOLTER ("NOLTER"), ERIC NOLTER *aka* ARYKSIN NOBLE ("ERIC NOLTER."), FACTOR EUROPE U.K. LIMITED ("FACTOR EUROPE"), and DOES 1-10, (collectively "Defendants") and alleges as follows:

## NATURE OF ACTION

1.    This is an action by OPS to recover over $6 million in funds looted from ECS World ("ECS") and, more precisely its merchants, including Menzia Trading Limited ("MENZIA"), whose claims have been assigned to Plaintiff. Defendants, in the guise of operating a credit card processing solution, implemented a massive fraudulent scheme. Using assorted bribes and profit-sharing inducements, Defendants were able to acquire an essential Visa/Mastercard merchant banking relationship and accounts through HANDELSBANKEN, imbuing themselves with the aura of legitimacy and reputability that concealed their prior history of rampant banking fraud.

2.    Representing that their "Scandorder" processing solution would minimize settlement delays with Visa/Mastercard and optimize merchant receipt of credit-card funds, Defendants were able to acquire ECS' merchant payment transactions. In reliance on Defendants' representations, most focally the existence of the pivotal Visa/Mastercard approved merchant banking relationship through HANDELSBANKEN, ECS permitted Defendants to process millions of dollars in merchant payments. However, though

COMPLAINT                                                                    2

1  HANDELSBANKEN collected ECS' merchants' funds from Visa/Mastercard,

2  Defendants failed to turn over $ 6,236,372 of such funds.  Accordingly, Plaintiff now

3  seeks compensatory and punitive damages, prejudgment interest, attorneys' fees, costs,

4  and such other and further relief as this Court deems proper and just.

5                                **THE PARTIES**

6         3.      Plaintiff OPS is a corporation organized and existing under the laws of the

7  state of New York with its principal place of business in New York City, doing business

8  in this District.

9         4.      Plaintiff is informed and believes that Defendant HANDELSBANKEN is

10  a Swedish public banking company with 456 branches worldwide, doing business in the

11  State of New York.  Defendant HANDELSBANKEN is transacting and doing business in

12  this judicial district, and has maintained its branch office at 875 Third Avenue, New

13  York, New York since at least 1987.  Defendant is subject to the personal jurisdiction of

14  this Court.

15        5.      Plaintiff is informed and believes that Defendant JOHANSSON is an

16  individual, residing in Sweden, transacting and doing business in the State of New York,

17  within this judicial district, and is subject to the personal jurisdiction of this Court.

18        6.      Plaintiff is informed and believes that Defendant NOLTER is an

19  individual, residing at 4669 Kelly Drive, West Palm Beach, Florida, 33415, and

20  transacting and doing business in the State of New York, within this judicial district, and

21  subject to the personal jurisdiction of this court.

22        7.      Plaintiff is informed and believes that Defendant ERIC NOLTER is an

23  individual, residing in Fort Lauderdale, Florida, and transacting and doing business in the

24  State of New York, within this judicial district, and subject to the personal jurisdiction of

25  this court.

26        8.      Plaintiff is informed and believes that Defendant FACTOR EUROPE is a

27

28                                COMPLAINT                                3

1    United Kingdom limited liability company, transacting and doing business in the State of

2    New York, within this judicial district, and is subject to the personal jurisdiction of this

3    court. FACTOR EUROPE was formed by Defendant JOHANSSON, who serves as the

4    company's sole director.

5        9.    On information and belief, the true names and capacities, whether

6    individual, corporate, partnership, or otherwise of Defendants named herein as DOES

7    1-10, inclusive, are unknown and therefore Plaintiff sues Defendants by such fictitious

8    names. Defendant DOES 1-10, upon information and belief, are transacting and doing

9    business within this Judicial District, and are subject to the personal jurisdiction of this

10   court. Plaintiff is ignorant of the true names of DOES 1-10 and will ask leave of Court to

11   amend this complaint to show their true names and capacities when they have been

12   ascertained.

13       10.    Plaintiff is informed and believes that at all times, all Defendants herein,

14   whether named or fictitiously designated were the agents, servants, employees, joint

15   venturers, and/or the alter egos of the remaining Defendants, and the acts of each

16   Defendant were within the course and scope of their agency, service, employment, and

17   with permission, consent, and ratification of each other Defendant.

18                              **JURISDICTION AND VENUE**

19       11.    This Court has original jurisdiction over this action pursuant to 28 U.S.C §

20   1332(a) subdivisions (1) and (2), in that the matter in controversy exceeds the sum or

21   value of $75,000, exclusive of interest and costs, and is between, the citizens of a State

22   and citizens or subjects of a foreign state.

23       12.    Venue for this action is proper in this district, pursuant to 28 U.S.C. §

24   1391. Defendants are doing business in this judicial district, and a substantial part of the

25   events or omissions giving rise to Plaintiff's claims occurred in this district. In addition,

26   Defendant HANDELSBANKEN may be found in this judicial district and, has

27   maintained its branch office in this judicial district since 1987. Defendants are subject to

28                                  COMPLAINT                                    4

1  personal jurisdiction in this district at the time of the commencement of this action, and

2  venue for this action is, thus, properly within the Southern District of New York.

3  <center>**COMMON FACTS**</center>

4      13.    Plaintiff OPS is a New York corporation, which has been assigned the

5  above-listed claims of ECS, a corporation duly organized and existing under the laws of

6  the United Kingdom, which include the specific claims of MENZIA, a limited liability

7  company organized and existing under the laws of the Republic of Cyprus.

8      14.    MENZIA is a company engaged in the business of operating an online

9  pharmacy, selling discount medications by prescription to consumers through its website.

10  For example, New York consumers, whose doctors have issued them valid prescriptions,

11  access MENZIA's website, and present and fill these prescriptions online, receiving their

12  medications via mail.

13      15.    Since 1999, ECS has been engaged in the business of assisting Internet

14  merchants, such as MENZIA, with securing online payment solutions, essentially

15  consisting of credit card processing software installed on the merchants' computers.

16  New York consumers accessing merchant sites, such as MENZIA's, make their purchases

17  in an online transaction, utilizing their credit cards for payment. In turn, the purchasers'

18  credit cards are processed via an intricate payment system that properly culminates with

19  the Visa/Mastercard funds being credited to the merchants' (e.g., MENZIA's) accounts.

20  <center>**ECS' AGREEMENT WITH SCANDORDER**</center>

21      16.    In July 2004, ECS entered into an agreement with Scandorder Inc.

22  ("Scandorder"), also known as Scandor.com, for use of Defendants' credit card online

23  processing solution. Plaintiff is informed and believes that Scandorder is a Florida

24  Corporation created by Defendants NOLTER and ERIC NOLTER on May 5, 2004, just

25  two months before the execution of the ECS agreement. NOLTER is also listed as sole

26  officer and director of Scandorder.

27

28  <center>COMPLAINT</center>          5

17.     Pursuant to such agreement, Defendants' Scandorder credit card processing solution was to be used to expedite payment transactions for ECS' merchant clients, including MENZIA.  In order to induce ECS into entering such agreement, Defendants represented themselves as third-party processors acting "in cooperation with international acquiring banks" for the purpose of processing Internet online Visa and Mastercard credit card transactions.  More specifically, Defendants represented that they had a Visa/Mastercard approved relationship through their acquiring bank, namely HANDELSBANKEN, a prominent, A+ rated international bank with hundreds of millions of dollars in assets.  Defendants further represented that their Scandorder processing solution would minimize settlement delays with Visa/Mastercard and optimize ECS' merchants' timely receipt of full credit-card funds.

18.     In reliance on Defendants' representations, most focally the existence of the pivotal Visa/Mastercard approved merchant banking relationship through HANDELSBANKEN, ECS, acting in its capacity as a 'master merchant,' agreed to use Defendants' technology to process ECS' merchants' transactions.

## INTERNET CREDIT CARD PROCESSING

19.     Though it is far from transparent to users, Internet payment transactions require an elaborate chain of procedures, spanning multiple parties, and with consequent time-lags and delays.  Consumers accessing the individual websites of ECS' merchants and selecting items for purchase only know that they are inputting their credit-card information as immediate payment for goods or services.  In reality, while a merchant such as MENZIA may ship the items in question, it does not secure any actual funds until considerably thereafter.

20.     In essence, MENZIA used the consumer's credit-card information to put in an order via Scandorder's third-party credit card processing solution to HANDELSBANKEN, as Defendants' acquiring bank.  HANDELSBANKEN then put in

1  an order to Visa/Mastercard for eventual payment of funds to Defendants, who were then

2  responsible for dispersing such funds to ECS.

3        21.    At the outset, the funds in issue originated from consumers' credit cards

4  drawn on "issuing banks," generally local to the consumer, and in this case including

5  local New York banks.  With authorization from Visa/Mastercard, these issuing banks

6  had 'issued' credit cards to various consumers, who subsequently inputted the assigned

7  credit card information into ECS' merchants' websites as a form of payment.

8        22.    Having acquired the consumers' credit card information, the merchants'

9  websites then relayed the credit-card transaction through Defendants' credit-card

10  processing software.  Defendants' software solution, in turn, transmitted the transaction to

11  HANDELSBANKEN, Defendants' "acquiring bank," also known as a "merchant bank,"

12  and with which Defendants had a banking relationship.  It is at this juncture that

13  HANDELSBANKEN'S computers took over the transaction, performing the focal task of

14  actually communicating with Visa/Mastercard to effect the retrieval and settlement of

15  merchant funds.

16  **DEFENDANTS' PIVOTAL ACQUISITION OF A VISA/MASTERCARD**
**MERCHANT BANKING RELATIONSHIP THROUGH HANDELSBANKEN**

17

18        23.    Defendants'    Visa/Mastercard    banking    relationship    through

19  HANDELSBANKEN, as the acquiring or merchant bank, constituted the fundamental

20  and operative link in Defendants' credit-card processing operation.  On information and

21  belief, merchant accounts are subject to rigorous and exacting pre-qualification

22  requirements that make such accounts difficult to attain for many merchants.  Without a

23  merchant banking relationship, and the all-crucial merchant account, there can be no

24  credit-card processing, and, thus, in actuality, no bona fide online business.

25        24.    In effect, on information and belief, all merchant accounts must be

26  sponsored    by    a    Visa/MasterCard    Acquiring    Member    Bank,    such    as

27  HANDELSBANKEN, which bank is consequently responsible for ensuring that a

28                             COMPLAINT                      7

1  prospective merchant, like Defendants, is in strict compliance with Visa and
2  MasterCard's rules and regulations.     On information and belief, it is
3  HANDELSBANKEN, as the acquiring bank, that was responsible for screening,
4  investigating and endorsing Defendants, as one of the few select merchants from which it
5  intended to "acquire" Visa/Mastercard transactions. Plaintiff is informed and believes
6  and thereupon alleges that it is HANDELSBANKEN, therefore, that warranted to
7  Visa/Mastercard that Defendants' originally met and, thereafter continued to meet,
8  Visa/Mastercard's exacting rules and regulations promulgated with a view to preventing
9  and protecting against fraud.     It is this consequent apparent "approval" by
10 Visa/Mastercard that also vested Defendants with the imprint of validity and legitimacy
11 to outside merchants, such as ECS and MENZIA, causing such merchants to invest
12 millions of dollars in processing funds.

13      25.     On information and belief, under Visa/Mastercard rules and procedures,
14 HANDELSBANKEN, as the acquiring bank, was obligated to subject Defendants to a
15 mandatory, comprehensive verification process prior to execution of any merchant
16 agreement.  On further information and belief, such mandatory screening procedures
17 included credit checks, background investigations, reference checks, physical inspection
18 of the business premises and records, investigations concerning the owners, principals, or
19 partners of the entities applying for the merchant account, and examination of the
20 merchant's previous merchant agreements etc.

21      26.     Plaintiff is informed and believes and thereupon alleges that
22 Visa/Mastercard's security precautions, implemented with a view to preventing fraud,
23 permitted HANDELSBANKEN as an acquiring bank to open accounts only for verified,
24 established merchants.  By opening such merchant account HANDELSBANKEN
25 conveyed the message that Defendants were legitimate, reputable, and met with
26 Visa/Mastercard's stamp of approval.

27
28                                 COMPLAINT                                 8

27.   In the case at hand, once Defendants were accepted by HANDELSBANKEN as their acquiring bank, the Bank's computers essentially served as an indispensable gateway to Visa/Mastercard, relaying codes and security protocols on Defendants' behalf.   After Visa/Mastercard approved the credit-card transactions, it dispensed the funds to HANDELSBANKEN. HANDELSBANKEN, in turn, deposited these funds into a "merchant account," from which such funds were transferred into an account in the name of FACTOR EUROPE. From the FACTOR EUROPE account, the funds were then to be wired to ECS' account, for eventual dispersal to the accounts of ECS' individual merchants.  However, to date, millions of dollars of such funds remain unaccounted for by Defendants.

## DEFENDANTS' HANDELSBANKEN ACCOUNT ALLOWS THEM TO CONVERT $6 MILLION FROM PLAINTIFF

28.   In executing their complicated scheme, Defendants worked in concert. Defendant NOLTER incorporated and ran Scandorder, and was involved in the development and operation of the software processing solution, including controlling its computer servers, located in both Florida and Sweden.   On information and belief, Defendant NOLTER has an extensive history of involvement with assorted fraudulent business dealings.  NOLTER's son, ERIC NOLTER ran Scandorder along with his father. ERIC NOLTER also served as the technical expert for the scheme; working along with his father, he was instrumental in designing the computer interfaces that communicated with the bank's computers, facilitating the processing of merchant funds, as well as the web page design and graphics. ERIC NOLTER also actively worked with HANDELSBANKEN'S computers and programers to process merchant funds.  ERIC NOLTER was also a liaison between programmers and the bank, and upon information and belief actually physically met with HANDELSBANKEN at his father's request in order to help establish the banking relationship with HANDELSBANKEN that JOHANSSON brought to them.

COMPLAINT                                    9

1      29.    Defendant JOHANSSON, working through Defendant FACTOR

2    EUROPE and a now-bankrupt entity known as Scandinavian Net Logistics ("SNL"), was

3    in charge of the key task of setting up the vital Visa/Mastercard banking relationship for

4    Defendants.  On information and belief, via (I) the payment of various kickbacks or

5    bribes and/or (ii) by allowing HANDELSBANKEN employees to participate in the

6    profits earned by Defendants' credit-card processing scheme (not to mention the fees that

7    HANDELSBANKEN also earned for every transaction Defendants' processed),

8    JOHANSSON was able to "purchase" the necessary and indispensable banking

9    'relationship' with HANDELSBANKEN, complete with the all-crucial "merchant

10   account."

11     30.    Accordingly, on or about June 2, 2004, Defendants and

12   HANDELSBANKEN entered into a merchant banking agreement.  The merchant

13   agreement was set up in the names of SNL and Scandor.com.  In turn,

14   HANDELSBANKEN also opened a merchant account for JOHANSSON in a branch

15   located in London in the name of an entirely different entity, FACTOR EUROPE, the

16   United Kingdom limited liability company that JOHANSSON had formed only a mere

17   two weeks earlier in May 2004.  It was the FACTOR EUROPE account to which

18   HANDELSBANKEN eventually dispersed ECS' Visa/Mastercard funds.

19     31.    This, having established that crucial merchant banking relationship with

20   HANDELSBANKEN in June 2004, and used such relationship to induce a processing

21   agreement with ECS in July 2004, Defendants began their sophisticated fraudulent

22   processing scheme.  From August 23, 2004, through July 17, 2005 HANDELSBANKEN

23   processed Defendants' Visa/Mastercard transactions, including those belonging to ECS,

24   eventually dispensing such funds to the FACTOR EUROPE account.  The relationship

25   between Defendants and HANDELSBANKEN only terminated when Visa/Mastercard

26   launched an investigation into HANDELSBANKEN and the Defendants, suspecting that

27   there were violations of Visa/Mastercard's mandatory merchant rules.  As a consequence

28                              COMPLAINT                              10

1    of such investigation, HANDELSBANKEN was forced to terminate Defendants'

2    merchant agreement, halting the processing of credit-card funds.

3        32.    On information and belief, HANDELSBANKEN, even after

4    Visa/Mastercard's reprimand and demand for termination of accounts, did not fire the two

5    employees responsible for having improperly opened Defendants' accounts; to the

6    contrary, the two employees, Paul Breakspeare and Sarah Gustafsson, were merely

7    reassigned to London, and Sweden, respectively. In effect, to this day, on information

8    and belief, HANDELSBANKEN maintains it is continuing to "investigate" its role in the

9    Defendants transactions, but with no apparent conclusion or resolution. In addition,

10   Plaintiff is informed and believes, and thereupon alleges, that HANDELSBANKEN

11   continues to permit JOHANSSON to operate and transact other business through the

12   FACTOR EUROPE account, which conveniently remains open.

13   **DEFENDANT JOHANSSON'S HISTORY OF BANKING FRAUD**

14       33..    Defendant JOHANSSON'S acquisition of the essential Visa/Mastercard

15   merchant account with HANDELSBANKEN, complete with the aura of legitimacy

16   conveyed thereby, enabled Defendants to access and appropriate Plaintiff's funds. On

17   information and belief, Defendant JOHANSSON had been refused such accounts at

18   various other banking institutions. In effect, JOHANSSON was only able to secure the

19   HANDELSBANKEN account through various bribes/kickbacks, as well as profit-sharing

20   arrangements with HANDELSBANKEN, which motivated the banking entity to provide

21   substantial assistance to Defendants' fraudulent scheme.

22       34.    Indeed, JOHANSSON'S history of fraudulent banking transactions alone

23   should have more than foreclosed his ability to secure a merchant account at any

24   institution, including HANDELSBANKEN. For example, on information and belief,

25   until mid-2003, JOHANSSON was sole shareholder and owner of Bank Crozier in

26   Granada, which lost its banking license in April 2003, and was liquidated by court-order

27   on July 24, 2003 as a result of rampant fraud and abuse of depositors' money.

28                              COMPLAINT                                11

35.    At the time of liquidation, the court-appointed liquidator issued multiple reports accusing JOHANSSON of converting $11.5 million from depositors' funds for his own use, including helping himself to numerous unsecured loans from depositors' accounts. The liquidator's reports concluded that "The CEO Mr. Peter Johansson and his friends used the bank as a vehicle to extract funds from legitimate depositors and to utilize these funds for their own purpose. Clearly steps must be taken to ensure that legal proceedings are instituted against these individuals with regard to their outstanding balances and loans that are unpaid," and further stated that "millions of dollars were transferred to Peter Johansson, either directly or through vehicles in which they had a beneficial interest." On information and belief, JOHANSSON was also accused of using the Bank of Crozier to launder money.

36.    Plaintiff is informed and believes and thereupon alleges that JOHANSSON'S involvement in the Bank of Crozier scheme was no isolated incident; rather Defendant JOHANSSON has been arrested and jailed multiple times due to various accusations of fraud, including with respect to internet banking ventures.

37.    Plaintiff is also informed and believes and thereupon alleges that JOHANSSON and the other Defendants are being investigated by the Swedish Economics Crime Bureau, and Scotland Yard, with the latter in particular, specifically, investigating HANDELSBANKEN'S involvement in Defendants' multi-million dollar fraudulent scheme.

39.    On further information and belief, in the context of the Bank Crozier collapse, JOHANSSON also apparently failed to pay Mastercard nearly $500,000 in fees, causing Mastercard to terminate membership. Mastercard only recovered these funds after JOHANSSON was removed from the Bank of Crozier. Accordingly, Plaintiff is informed and believes that HANDELSBANKEN'S merchant relationship with JOHANSSON was contrary to Mastercard's mandatory rules, and therefore remained intentionally undisclosed and unknown to Visa/Mastercard.

<div align="center">COMPLAINT</div>

12

40.    Plaintiff is informed and believes and thereupon alleges that Defendant NOLTER'S background history reveals a similar pattern of criminal activity, including through numerous online processing entities that have been accused of stealing funds. On further information and belief, NOLTER also has a felony criminal record, and ties to collapsed banking entities in Granada, as well. ERIC NOLTER also, on information and belief, has extensive involvement in online credit card processing schemes, and has accordingly changed his name to ARYKSIN NOBLE in an attempt to conceal his background.

### ECS' AGREEMENT WITH DEFENDANTS

41.    Beginning on or about July 29, 2004, having been induced by Defendants' purportedly approved Visa/Mastercard banking relationship through HANDELSBANKEN, ECS entered into an agreement with Defendants for processing of ECS' merchant credit card transactions.  Accordingly, beginning in August 2004 and ending in July 2005, Defendants processed ECS' merchants' credit-card transactions through their relationship with HANDELSBANKEN.  HANDELSBANKEN, acting on Defendants' behalf, indeed acquired the funds from Visa/Mastercard, eventually settling them in JOHANSSON'S account in the name of FACTOR EUROPE located in HANDELSBANKEN'S London branch.

42.    By June 2005, Defendants had secured from Visa/Mastercard, but failed to turn over to Plaintiff some $6,236,372 in funds.  On information and belief, at HANDELSBANKEN's instruction, Visa/Mastercard had indeed dispersed these funds into the FACTOR EUROPE account; however, as had occurred with accounts at the Bank of Crozier, these funds mysteriously disappeared on Defendant JOHANSSON'S watch.

43.    Despite repeated demands that the Defendants turn over to ECS the $6 million in funds in issue, and repeated representations from Defendants, including JOHANSSON and NOLTER, that such funds were forthcoming, Defendants continued

COMPLAINT                                    13

1  and continue to retain such sums. At the outset, Defendants claimed that the funds were

2  being held back to protect against charge-backs, referring to customer returns or refunds

3  that might need to be eventually credited back to Visa/Mastercard. ECS relied on this

4  representation; however, with the elapse of greater and greater periods of time, it became

5  clear that this representation was false.

6      44.      Accordingly, in a March 20, 2006 e-mail to JOHANSSON, ECS noted

7  that six months had elapsed since processing had ceased, all banking funds should have

8  been released to Defendants, and all chargebacks long accounted for -- thus, demanding

9  that the unaccounted for $6,236,372 be immediately turned-over to ECS and its

10  merchants. Notwithstanding the same, Defendants have failed and refused to return any

11  of these funds, offering no explanation for such willful conduct.

12      45.      As a result of Defendants' conduct, ECS' merchants have been deprived

13  and denuded of millions, and hundreds of New York consumers, who made purchases

14  from ECS' merchants online, likewise await the return of funds to their New York issuing

15  banks.

16      46.      Defendants have acted maliciously and wantonly, with oppression, insult,

17  wanton or reckless disregard of the Plaintiff's rights in looting $6 million of merchant

18  funds, entitling Plaintiff to punitive damages in the form of a percentage of Defendants'

19  profits, but no less than $25 million.

20          **FIRST CLAIM FOR RELIEF**
    **(Against JOHANSSON, NOLTER, ERIC NOLTER and FACTOR EUROPE)**

21              **(Conversion)**

22      47.      Plaintiff incorporate paragraphs 1 - 46 herein as if set forth in full.

23      48.      On or about March 20, 2006, Defendants converted $6,236,372 of

24  Plaintiff's funds. The funds in issue belonged to ECS and its respective merchants, who

25  were the owners of such monies and entitled to immediate possession thereof.

26      49.      Defendants initially took possession of the funds lawfully pursuant to an

27  agreement that related entities would process Plaintiff's credit cards, settle such funds

28                      COMPLAINT                              14

from Visa/Mastercard, and deposit them into a merchant account at HANDELSBANKEN. These funds were then to be wired to ECS' account at Lloyd's TSB Bank.

50.    Over the course of the period from August 23, 2004, till July 17, 2005, Defendants came into possession of $6,236,372 of Plaintiff's money, which funds were eventually settled by Visa/Mastercard into Defendants' HANDELSBANKEN account in London in the name of FACTOR EUROPE, but never surrendered to ECS or its merchants.

51.    On March 20, 2006, ECS demanded the return of the $6,236,372 in funds.

52.    Notwithstanding such demand, Defendants have failed and refused to return any of these funds. ECS' funds, which were settled into Defendants' FACTOR EUROPE account, have been removed and transferred elsewhere by Defendants, and never surrendered to ECS.

53.    Defendants have unlawfully converted $ 6,236,372 to their own use. Accordingly, Plaintiff has been damaged in the amount of $6,236,372, plus special damages in an amount to be proven at trial as a result of damage to Plaintiff's business reputation and credit.

54.    Plaintiff is also entitled to punitive damages because Defendants acted maliciously and wantonly, with oppression, insult, wanton or reckless disregard of the Plaintiff's rights or other circumstances of aggravation in converting millions of dollars from ECS' merchants. Defendants engaged in intentional and deliberate wrongdoing; with aggravating or outrageous circumstances; had a fraudulent or evil motive; or engaged in a conscious act that willfully and wantonly disregarded the rights of Plaintiff, justifying such award.

1

### SECOND CLAIM FOR RELIEF
### (Against HANDELSBANKEN)
2                    **(Aiding & Abetting Conversion)**

3       55.     Plaintiff incorporate paragraphs 1 - 46 herein as if set forth in full.

4       56.      Defendants JOHANSSON, NOLTER, ERIC NOLTER, and FACTOR

5 EUROPE unlawfully converted $6,236,372 in funds to their own use, which funds belong

6 to ECS and its merchants.

7       57.      Defendant HANDELSBANKEN, in turn, aided and abetted such

8 conversion by providing the other Defendants with substantial assistance.

9 HANDELSBANKEN had actual knowledge that Defendants were engaged in the process

10 of converting Plaintiff's funds.

11       58.      Via the payment of assorted kickbacks or bribes and/or by allowing

12 HANDELSBANKEN employees to participate in the profits of their fraudulent scheme,

13 JOHANSSON was able to secure a necessary and indispensable banking 'relationship'

14 with HANDELSBANKEN, complete with the all-crucial "merchant account," and access

15 to Visa/Mastercard.  In the same vein, HANDELSBANKEN, by opening such merchant

16 accounts, permitted the other Defendants to appear as if they were sponsored by and

17 approved of by Visa/Mastercard, allowing all Defendants to exploit this apparent stamp

18 of legitimacy and induce greater and greater access to merchant funds.

19       59.     HANDELSBANKEN further aided and abetted Defendants' conversion by

20 concealing and overlooking Defendants' considerable history of fraudulent banking

21 transactions, which should have precluded their ability to secure a merchant account at

22 any institution, including HANDELSBANKEN.  In fact, on information and belief, as

23 HANDELSBANKEN was well aware, among other things, that only a year or so earlier,

24 JOHANSSON had been accused of converting $11.5 million from depositors' funds for

25 his own use, causing the collapse of the Crozier Bank.  Defendant had also been CEO

26 and sole shareholder of an entity whose merchant relationship was terminated by

27 Mastercard.  On information and belief, HANDELSBANKEN'S merchant relationship

28                         COMPLAINT                         16

1    with JOHANSSON was contrary to Mastercard's mandatory rules, and therefore went

2    intentionally undisclosed and unknown to Visa/Mastercard, thus, permitting Defendants

3    to enjoy an account to which they otherwise had no right, and without which they could

4    not have converted millions of dollars in Plaintiff's funds.

5        60.    On information and belief, under Visa/Mastercards rules and procedures,

6    HANDELSBANKEN, as the acquiring bank, was obligated to subject Defendants

7    JOHANSSON, NOLTER, ERIC NOLTER, and FACTOR EUROPE, as well as SNL and

8    Scandor.com, to a mandatory, comprehensive verification process prior to execution of

9    any merchant agreement.  On information and belief, it was further obligated to monitor

10   and certify that Defendants continued to meet all mandatory screening procedures,

11   including via credit checks, background investigations etc.    Accordingly,

12   HANDELSBANKEN was therefore well aware, but did not convey to Visa/Mastercard,

13   among other things, that Defendants' companies were not established entities; that

14   Defendants, including Defendants NOLTER and JOHANSSON, as principals in such

15   entities, had a background in expediting massive fraudulent schemes; and that Defendant

16   JOHANSSON had previously been party to a merchant agreement that Mastercard had

17   terminated.  On information and belief, by failing to convey such mandatory information

18   to Visa/Mastercard, HANDELSBANKEN substantially assisted Defendants in not only

19   acquiring, but holding onto their merchant account, thus, evading Visa/Mastercard's

20   termination.

21       61.    Defendant HANDELSBANKEN, having accepted bribes/kickbacks and

22   invested in the very scheme that it sought to protect and conceal, enabled Defendants to

23   implement and continue with their conversion of Plaintiff's funds, ultimately allowing

24   them to raze $6 million over time.

25       62.    Defendant HANDELSBANKEN rendered substantial assistance in the

26   achievement of JOHANSSON, NOLTER, ERIC NOLTER and FACTOR EUROPES'

27   conversion of $ 6,236,372.  While concealing the true facts from Visa/Mastercard,

28                           COMPLAINT                        17

1    HANDELSBANKEN permitted Defendants to secure a merchant account, fully aware

2    that Defendants were not entitled to such account pursuant to Visa/Mastercard's security

3    protocols. Defendant JOHANSSON'S acquisition of the essential merchant account with

4    HANDELSBANKEN, complete with the aura of legitimacy conveyed thereby, enabled

5    Defendants to access and loot $6 million dollars of Plaintiff's money.

6        63.    HANDELSBANKEN affirmatively assisted Defendants in the conversion

7    and Plaintiff's injury was a direct or reasonably foreseeable result of the complained of

8    conduct.

9                        **THIRD CLAIM FOR RELIEF**
                         **(Against HANDELSBANKEN)**
10                       **(Aiding & Abetting Fraud)**

11       64.    Plaintiff incorporate paragraphs 1 - 46 herein as if set forth in full.

12       65.    On or about July 29, 2004, in order to induce ECS into entering into an

13   credit-card processing agreement, Defendants, acting through Scandor.com personnel

14   Walid el Houri in Florida, represented that Defendants had an approved Visa Mastercard

15   relationship through HANDELSBANKEN. Defendants further represented that they

16   were legitimately "a company active as a third party processor in cooperation with

17   international acquiring banks for the purpose of processing Internet online Visa and

18   Mastercard credit card transactions." Defendants also represented that their superior

19   credit card processing technology would permit for fewer settlement delays and more

20   timely receipt of merchant credit-card funds. These representations were made by Walid

21   el Houri acting on the Defendants' behalf.

22       66.    Defendants concealed the material fact that their Visa/Mastercard banking

23   relationship through HANDELSBANKEN was established only recently through the

24   payment of various kickbacks and bribes, and on information and belief, in violation of

25   Visa/Mastercard's rules and regulations. Defendants, further, at no time disclosed that

26   the company had only acquired that banking relationship one month earlier, and that

27   Defendants had a long-standing history of fraudulent banking practices. Instead,

28                                COMPLAINT                                    18

1    Defendants represented as a material fact that they would supply ECS' merchants with a

2    credit card processing network that would permit merchants to secure Visa/Mastercard

3    funds in an expedited and more complete manner.

4        67.    These representations were false when made, and Defendants knew them

5    to be false. Defendants were not a company active as a third-party processor, in that they

6    had only established a relationship with HANDELSBANKEN a mere month earlier.

7    Defendants' banking relationship with HANDELSBANKEN had not come as a result of

8    the standard compliance with Visa/Mastercards rules and regulations, and therefore with

9    Visa/Mastercard's approval, but rather through a course of bribes, kickbacks and profit

10   sharing conspiracies.  Defendants had a long history of fraudulent activities, including,

11   taking funds from online processing schemes.  Moreover, Defendants' promise that their

12   system would provide for the quicker and more precise settlement of funds was a false

13   promise, in that it was made without the intention of performing it.  Defendants' actual

14   intent was to appropriate millions of dollars of ECS' merchant funds for their own use,

15   consistent with the long history of fraudulent banking activities perpetrated by

16   Defendants. Defendants intended ECS to rely on such misrepresentations, and process its

17   merchant funds with Defendants.

18       68.    Plaintiff relied on Defendants' representations, and entered into a

19   processing agreement, providing Defendants with access to millions of dollars in

20   merchant credit-card funds in the process.  Plaintiff's reliance was justified in that

21   Defendants had an apparent "approved" relationship with Visa/Mastercard through

22   HANDELSBANKEN, and there was no reason to believe that Defendants had been able

23   to secure such a relationship through bribes, and despite their shady and sub-par banking

24   history, complete with accusations of at least $11 million worth of stolen funds.

25       69.    Defendants JOHANSSON and NOLTER continued to make these same

26   representations and omissions throughout this same period.

27

28                               COMPLAINT                    19

70.    At this stage of the action, Plaintiff is unable to state the circumstances of the fraudulent scheme in more detail because that information is exclusively in Defendants' possession; however, on or about March 20, 2006, Defendants, including in particular JOHANSSON and FACTOR EUROPE stole $6,236,372 of Plaintiff's funds, by failing to turn over such ECS funds, which funds were withdrawn from the FACTOR EUROPE account, but never forwarded to ECS' account.  Despite knowledge of such bribes and kickbacks, HANDELSBANKEN allowed and continues to allow the FACTOR EUROPE account to remain open.

71.    Defendant HANDELSBANKEN aided and abetted the other Defendants in the perpetration of their fraud.  Defendant HANDELSBANKEN affirmatively assisted, concealed, and failed to act when required to do so, in order to enable the other Defendants' acts of fraud to advance and progress.

72.    Defendant HANDELSBANKEN had actual knowledge that the other Defendants were engaged in perpetrating such fraud, but concealed and failed to act to stop such conduct.  Instead, HANDELSBANKEN'S employees were vested in the continued propagation of such fraud, as a result of their receipt of various forms of profits, kickbacks/bribes and fees.  On information and belief, HANDELSBANKEN, thus, not only set up the merchant banking relationship that facilitated the entire fraud, but concealed from Mastercard JOHANSSON'S role in the implosion of the Bank of Crozier, and JOHANSSON'S participation in a prior Mastercard terminated merchant agreement.  On information and belief, HANDELSBANKEN'S merchant relationship with JOHANSSON was contrary to Mastercard's mandatory rules, and therefore went intentionally undisclosed and unknown to Visa/Mastercard, to avoid termination of Defendants' agreement and account.

73.    On information and belief, under Visa/Mastercard rules and procedures, HANDELSBANKEN, as the acquiring bank, was obligated to subject Defendants, including JOHANSSON and FACTOR EUROPE to a mandatory, comprehensive

COMPLAINT                                           20

1   verification process prior to execution of any merchant agreement, and thereafter. By

2   failing to report Defendants' noncompliance with these mandatory rules,

3   HANDELSBANKEN facilitated and extended the life of the fraud. Accordingly, among

4   other things, HANDELSBANKEN failed to convey to Visa Mastercard that FACTOR

5   EUROPE was barely established; that Defendants JOHANSSON and NOLTER, as

6   principals in such entities had a background in expediting massive fraudulent schemes;

7   and that Defendant JOHANSSON'S previous merchant agreement had been terminated.

8   Accordingly, Defendant HANDELSBANKEN was well aware that the other Defendants

9   were engaged in attempting to convert Plaintiff's funds through a course of fraud, and

10   accepted the bribes/kickbacks in return for permitting, facilitating and benefitting from

11   Defendants' perpetration of such fraud.

12      74.    Defendant HANDELSBANKEN rendered substantial assistance in the

13   achievement of JOHANSSON and FACTOR EUROPE's fraudulent appropriation of

14   $6,236,372. While concealing the true facts from Visa/Mastercard,

15   HANDELSBANKEN permitted Defendants to secure a merchant account, fully aware

16   that they were not entitled to such account pursuant to Visa/Mastercard's rules and

17   security protocols. Defendant JOHANSSON's acquisition of the essential merchant

18   account with HANDELSBANKEN, complete with the aura of legitimacy conveyed

19   thereby, enabled the very mechanism by which Defendants were able to access Plaintiff's

20   money and perpetrate their multi-million dollar fraud.

21      75.    HANDELSBANKEN affirmatively assisted Defendants in the fraud and

22   Plaintiff's injury was a direct or reasonably foreseeable result of the complained of

23   conduct.

24      76.    Plaintiff is entitled to compensatory damages according to proof, as well

25   as exemplary or punitive damages because Defendant's wrongful act is egregious, done

26   willfully, wantonly, or maliciously, or is characterized by other aggravating

27   circumstance.

28                  COMPLAINT            21

1

## FOURTH CLAIM FOR RELIEF
### (Negligence)
### (Against HANDELSBANKEN)

2

3    77.    Plaintiff incorporate paragraphs 1 - 46 herein as if set forth in full.

4    78.    Defendant, as a Visa/Mastercard acquiring bank, had a legal duty to

5    Plaintiff to use due care in opening and monitoring merchant accounts. Defendant was

6    aware that Defendants were acting as a third party processor, and therefore had a duty to

7    Plaintiff or the class of person to which Plaintiff is a member, comprised of other

8    merchants.    In addition, HANDELSBANKEN was aware that Defendants were

9    processing consumer credit-card transactions and had a duty to said consumers.

10    79.    Defendant had a duty as a financial institution to investigate Defendants as

11    a prospective merchant before allowing them to process millions of dollars of credit-card

12    transactions through a HANDELSBANKEN account. On information and belief, Visa/

13    Mastercard's rules and regulations, required that Defendant HANDELSBANKEN

14    carefully screen, including via background and credit checks, etc., SNL, Scandorder.com,

15    FACTOR EUROPE, and its principals, JOHANSSON, NOTLER and ERIC NOLTER as

16    prospective member merchant(s) and continuing thereafter, to protect against fraud.

17    80.    Defendant breached this duty of care by, among other things, failing to

18    comply with Visa/Mastercard rules and regulations, and enabling Defendants,

19    particularly JOHANSSON, to open such merchant account despite a history of fraudulent

20    banking transactions.

21    81.    By allowing Defendants to open and maintain merchant accounts at

22    HANDELSBANKEN, complete with the imprimatur of legitimacy conveyed thereby,

23    HANDELSBANKEN enabled the very mechanism by which Defendants were able to

24    access Plaintiff's money and perpetrate their multi-million dollar fraud. Defendant

25    HANDELSBANKEN conduct was thus a reasonably foreseeable and proximate cause of

26    Plaintiff's loss of $6 million in funds.

27

28                                COMPLAINT                                22

**FIFTH CLAIM FOR RELIEF**
(New York Uniform Deceptive Trade Practices Act; N.Y. CLS Gen. Bus. § 349)
(Against All Defendants)

82.    Plaintiff incorporate paragraphs 1 - 46 herein as if set forth in full.

83.    Defendants have engaged in deceptive trade practices when, in the course of their business, vocation, or occupation, they represented that the Defendants' merchant account with HANDELSBANKEN was associated with or certified by Visa/Mastercard, when in fact Defendants had merely utilized bribes and kickbacks to create this facade. In truth, on information and belief, the relationship was contrary to Visa/Mastercard rules and regulations, and when Visa/Mastercard learned of such relationship, it ordered HANDELSBANKEN to terminate said agreement and relationship.

84.    Defendants' conduct caused a likelihood of confusion or of misunderstanding as to (a) the source, sponsorship, approval, or certification of their goods or services; and (b) affiliation, connection, or association with, or certification by, another. Defendants deceptively represented that they had a Visa/Mastercard approved relationship through HANDELSBANKEN, when in reality, Defendants were engaged in the practice of deceiving Visa/Mastercard, merchants, and consumers, and converting their funds.

85.    Defendants' trade practices, have caused and will continue to cause damage to Plaintiff, who in reliance on such false affiliations, connections, associations with, certifications by, and representations, permitted Defendants to process millions of dollars of credit-card transactions, allowing Defendants to appropriate well-over $6 million in the process.

86.    As a direct and proximate cause of Defendants' conduct as alleged herein, Plaintiff has suffered harm and injury as set forth in the preceding paragraphs and has sustained corresponding actual damages according to proof.  These damages include funds due back to individual New York consumers, who number in the hundreds, and the New York issuing banks on which the consumers' credit cards are drawn.

COMPLAINT                                               23

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

      1.      On the first cause of action, for judgment against the Defendants for $ 6,236,372, plus prejudgment interest from the time of conversion, special damages, and for punitive damages.

      2.      On the second cause of action, for judgment against the Defendants for $6,236,372, plus prejudgment interest from the time of conversion, special damages, and for exemplary or punitive damages.

      3.      On the third cause of action, for compensatory damages according to proof, for prejudgment interest, and for exemplary or punitive damages.

      4.      On the fourth cause of action, for compensatory damages according to proof.

      5.      On the fifth cause of action, for actual damages and reasonable attorneys fees.

      6.      For costs of suit.

      7.      For such other relief as this Court deems proper and just.


DATED: October 8, 2007          Respectfully Submitted,

LYNCH ROWIN LLP

By: Marc Rowin
Attorneys for Plaintiff Online Payment Solutions Inc.,


DAVID STEINER & ASSOCIATES

By: David Steiner, Esq.
Attorneys for Plaintiff Online Payment Solutions Inc.,


COMPLAINT          24