UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/27/09
```

ONLINE PAYMENT SOLUTIONS INC.,

     Plaintiff,

 - against -

SVENSKA HANDELSBANKEN AB, PETER
LARS JOHANSSON, NICHOLAS
NOLTER, ERIC NOLTER a.k.a.
ARYKSIN NOBLE, FACTOR EUROPE UK
LIMITED, DOES 1-10,

     Defendants.

**OPINION AND ORDER**
07 Civ. 8692(PKL)

**APPEARANCES**

LYNCH ROWIN LLP
Marc Rowin, Esq.
630 Third Avenue
New York, New York 10017

DAVID STEINER & ASSOCIATES
David Steiner, Esq.
1925 Century Park East, Suite 2350
Los Angeles, CA 90067
**Attorneys for Plaintiff Online Payment Solutions Inc.**

WHITE & CASE LLP
Owen C. Pell, Esq.
Milana Salzman, Esq.
Rebecca M. Bodony, Esq.
1155 Avenue of the Americas
New York, New York 10036
**Attorneys for Defendant Svenska Handelsbanken AB**

**LEISURE, District Judge:**

Plaintiff Online Payment Solutions Inc. ("OPS") brings this diversity action against defendants Svenska Handelsbanken AB ("Svenska"), Peter Lars Johansson ("Johansson"), Factor Europe U.K. Limited ("Factor Europe"), and Nicholas Nolter and Eric Nolter, also known as Aryksin Nolter, (the "Nolter defendants"). Currently pending before this Court is Svenska's motion to dismiss the case (i) pursuant to the doctrine of forum non conveniens because Sweden and England are more appropriate fora to litigate this action, or, alternatively, (ii) pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 9(b) because OPS lacks standing to sue Svenska, fails to state any viable claims against Svenska, and fails to plead its complaint with the required particularity. For the following reasons, Svenska's motion is GRANTED and this case is dismissed on the basis of forum non conveniens, subject to the conditions discussed below. Because this Court finds that this dispute is more appropriately adjudicated in Sweden or in England, the Court does not reach Svenska's alternative grounds for dismissal.

**BACKGROUND**

This action arises out of an allegedly fraudulent scheme that involves individuals and entities in the United States, Sweden, and the United Kingdom. According to plaintiff's

complaint, defendants allegedly engaged in fraud, conversion, aiding and abetting fraud and conversion, negligence, and deceptive trade practices causing plaintiff over $6 million in damages. (See Compl. ¶¶ 48-53, 56-63, 65-75, 78-81, 83-85.)

## I.   The Parties

ECS World ("ECS"), a corporation organized and existing under the laws of the United Kingdom, assigned the claims now asserted in this action to OPS, a New York corporation. (Id. ¶¶ 1, 13.)  ECS was in the business of supporting internet merchants, and in particular, processing such merchants' online credit card transactions. (Id. ¶ 15.)  Jason Field ("Field") was the sole principal of ECS, and is now the sole principal of OPS. (Decl. of Jason Field in Opp'n to Def. Svenska Handelsbanken's Mot. to Dismiss the Compl. on Grounds of Forum Non Conveniens, sworn to on Mar. 13, 2008 ("Field Decl.") ¶ 1).  In addition to ECS's claims, OPS alleges that it has been assigned the claims of Menzia Trading Limited, one of ECS's merchant customers that was allegedly impacted by defendants' fraud. (See Compl. ¶ 1.)

Svenska, which is incorporated in Sweden, is one of the largest banks in Sweden, and it maintains its headquarters in Stockholm, Sweden. See Decl. of Ulf Köping-Höggård, sworn to on Dec. 18, 2007 ("Svenska Decl.") ¶¶ 2-3.)  As alleged in the complaint, Svenska's involvement with defendants' scheme was in its role as an "acquiring" or "merchant" bank to the other named

2

defendants. (See Compl. ¶ 1.) Plaintiff contends that an acquiring bank is responsible for effecting "the retrieval and settlement of merchant funds" after a credit card transaction is completed. (Id. ¶ 22.) In other words, when a merchant sells merchandise to a customer who pays by credit card, the merchant needs an acquiring bank to collect the money from the credit card company, and to send that money to the merchant to cover the costs of the sold merchandise.

The Nolter defendants incorporated Scandorder Inc. ("Scandorder"),[1] also known as Scandor.com, a Florida corporation that operated in Florida and Sweden, and which was purportedly in the credit card processing business. (Id. ¶¶ 16, 28, 65.) As such, in connection with the credit card processing services ECS provided to its customers, ECS entered into an agreement with Scandorder. (Id.) ECS contends that it entered into this agreement because it believed that Scandorder had a sophisticated credit card processing system, and that Svenska was Scandorder's acquiring bank. (See id. ¶¶ 16-17, 65.)

Finally, Johansson, a citizen and resident of Sweden, is the sole director of Factor Europe, a United Kingdom limited liability company. (See id. ¶8.) Like Scandorder, plaintiff

---

[1] Plaintiff is only proceeding against the Nolter defendants, and not against Scandorder itself.

alleges that Factor Europe had a banking relationship with
Svenska. (See id. ¶ 27, 29-31.)

## II.  Plaintiff's Allegations

To understand plaintiff's substantive claims, it is
necessary to review plaintiff's allegations as to the standard
practice for credit card processing of internet transactions.
As detailed in the complaint, generally, after an online
customer completes an online credit card transaction, the
merchant will send a customer the purchased goods and services
before receiving actual payment from the credit card company.
(See id. ¶ 16.)  Next, the credit card transaction is
transmitted through a credit card processing system to the
acquiring or merchant bank, which retrieves the settlement funds
from Visa or Mastercard. (See id. ¶¶ 20-22.)  Plaintiff alleges,
upon information and belief, that before becoming an acquiring
or merchant bank for a company, the bank is expected to conduct
extensive screening of that company, including investigating
that company and its owners, principals, or partners, and
conducting credit and background checks concerning that company.
(Id. ¶¶ 23-26.)  Visa and Mastercard purportedly have rules and
regulations that mandate such an investigation in an effort to
prevent and protect against fraud. (Id. ¶ 24.)  Plaintiff
further suggests that if a bank becomes an acquiring bank for an

4

entity, it is as if the bank is endorsing that company as a legitimate entity. (See id. ¶¶ 24, 26, 58, 62.)

Plaintiff alleges that credit card transactions handled on behalf of ECS's clients did not follow the standard process just described, and that Svenska failed to comply with its responsibilities as an acquiring bank.  Instead, plaintiff avers that defendants collectively engaged in an extensive and complicated fraud that resulted in ECS losing more than $6 million.  The first piece of this alleged fraud involves the relationship between ECS, Scandorder, and Svenska.  ECS avers that it was lead to believe that Scandorder had a credit card online processing system that would expedite payment transactions for ECS's customers, and that Scandorder had a Visa/Mastercard approved relationship with Svenska as its acquiring bank. (See id. ¶¶ 16-17, 65.)  In particular, plaintiff alleges that the Nolter defendants, acting through Scandorder personnel in Florida, namely Walid El Houri ("Houri"), made these representations to induce ECS to enter an agreement for use of the Scandorder processing system. (Id. ¶ 65.)  Plaintiff further alleges that Svenska created the appearance that Scandorder was "legitimate, reputable, and met with Visa/Mastercard's stamp of approval" by becoming its acquiring bank. (Id. ¶ 26.)  According to plaintiff, Scandorder established this banking relationship through various kickbacks

and bribes to Svenska and Svenska employees, and that Svenska's actions were in violation of the Visa/Mastercard rules and regulations. (See, e.g., id. ¶¶ 58, 60-62, 66-68, 73.)

Plaintiff asserts that the remainder of the fraud was carried out by Johansson, working through Factor Europe and a now bankrupt entity, Scandinavian Net Logistics ("SNL"). (See id. ¶¶ 29-32.) Plaintiff avers that Johansson used bribes and kickbacks to establish a merchant account at Svenska, and that Svenska ignored Johansson's history of fraudulent banking transactions when creating that account. (See id. ¶¶ 33-39.) With Svenska as the acquiring bank for Scandorder and as the merchant bank for Factor Europe and SNL, Svenska purportedly secured funds from Visa and Mastercard to settle the transactions for ECS's clients, but deposited the funds in Factor Europe's account. (See id. ¶¶ 41-42, 49-50, 52.) Plaintiff alleges that those funds subsequently disappeared, without ever making it to ECS or ECS's customers. (See id. ¶¶ 42, 49-50, 62, 70-72, 74.)

## III.    Svenska's Motion To Dismiss

In the instant motion, Svenska asks this Court to dismiss the case on the grounds of forum non conveniens, arguing that both Sweden and England are more appropriate fora to litigate this suit.  Svenska argues that plaintiff's choice of forum is entitled to no deference because, while OPS is a New York

corporation, it is not the real party in interest. (Svenska's
Mem. 5-6.) Svenska further contends that the core events and
the key witnesses and exhibits are located in Sweden, with
England having the next strongest connection to the suit. (Id.
at 6-7.) Moreover, Svenska asserts that both Sweden and England
are adequate alternative fora capable of resolving this dispute.
(Id. at 7-8.) Finally, according to Svenska, both the private
and public factors considered in a forum non conveniens analysis
weigh in favor of dismissal. (Id. at 9-11.)

Plaintiff disagrees with Svenska on each of these
considerations. First, OPS argues that plaintiff's choice of
forum is entitled to substantial deference because Field, who is
a United States resident, is the sole principal of OPS and was
the sole principal of ECS. (Pl.'s Opp'n 3-4.) Next, plaintiff
argues that Svenska's motion to dismiss must be denied because
Svenska is unable to demonstrate that all defendants are subject
to jurisdiction in the proposed alternative fora. (Id. at 6-7.)
Finally, plaintiff contends that the relevant private and public
interest factors do not support Svenska's motion to dismiss.
(Id. at 8-13.)

## DISCUSSION

## I. **Forum Non Conveniens Dismissal Standard**

The doctrine of forum non conveniens is based on the
principle that "'a court may resist imposition upon its

7

jurisdiction even when jurisdiction is authorized by the letter of a general venue statute.'" Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 153 (2d Cir. 2005) (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507 (1947)); In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in Dec., 1984, 634 F. Supp. 842, 845 (S.D.N.Y. 1986) (Keenan, J.) ("The doctrine of forum non conveniens allows a court to decline jurisdiction, even when jurisdiction is authorized by a general venue statute."), aff'd, 809 F.2d 195 (2d Cir. 1987). Notwithstanding the propriety of the action under the venue statute, "dismissal will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice." Piper Aircraft Co. v. Reyno, 454 U.S. 235, 249 (1981). The Supreme Court has declined to fashion the exact circumstances that would "'justify or require either grant or denial of remedy.'" Id. (quoting Gilbert, 330 U.S. at 508). Consequently, a district court's inquiry is highly fact-specific. Id. ("'Each case turns on its facts.'"(quoting Williams v. Green Bay & W.R. Co., 326 U.S. 549, 557 (1946))); Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivanos, 712 F. Supp. 383, 392-93 (S.D.N.Y. 1989) (Leisure, J.) ("The Supreme Court has emphasized the flexibility with which the District Court must approach a forum non

8

conveniens determination, and consequently there are no specific
circumstances which would require either a grant or denial of
the remedy.").

In exercising its discretion, the Court applies the three-
step analysis outlined by the Second Circuit's decision in
Iragorri v. United Technologies Corporation, 274 F.3d 65, 73-74
(2d Cir. 2001)(en banc):

> At step one, a court determines the
> degree of deference properly accorded
> the plaintiff's choice of forum.  At
> step two, it considers whether the
> alternative forum proposed by the
> defendants is adequate to adjudicate
> the parties' dispute.  Finally, at step
> three, a court balances the private and
> public interests implicated in the
> choice of forum.

Norex, 416 F.3d at 153 (internal citations omitted).

## II. Application of Forum Non Conveniens Principles to the Parties' Arguments

In applying the Second Circuit's three-step analysis, this
Court first concludes that plaintiff's choice of forum is
entitled to less than substantial deference.  Less deference is
appropriate because ECS, a British corporation, is the real
party in interest, and the acts in question, and the evidence
necessary to resolve this dispute, primarily occurred in Sweden
and England.  Second, the Court finds that both Sweden and
England are adequate alternative fora for adjudication of this
dispute.  Finally, after balancing the private and public

interest factors, this Court holds that this action is more
appropriately litigated in either Sweden or in England.
Nevertheless, to ensure that plaintiff actually has a forum in
which to pursue its claims, this Court conditions its dismissal
upon a foreign court accepting this case, upon a foreign court
asserting jurisdiction over all defendants, and upon defendants'
waiving any jurisdictional or statute of limitations defenses to
proceeding in such alternative forum.

### A.   Level of Deference to Plaintiff's Choice of Forum

In Iragorri, the Second Circuit convened en banc to clarify
the appropriate degree of deference for a United States
plaintiff's choice of forum where the chosen forum is different
from where a plaintiff resides. 274 F.3d at 69.  In explaining
how district courts should determine the level of deference to
accord to such a plaintiff's choice of forum, the Iragorri Court
made a broader statement as to how courts should determine the
appropriate level of deference for any plaintiff's choice of
forum.  As the Second Court explains, it is clear from Supreme
Court precedent that a plaintiff's choice of her home forum
should be given great deference, and that a foreign resident's
choice of a United States forum should receive less
consideration. Id. at 71.  These teachings, the Iragorri Court
explains, are indicative of a "broader principle under which the
degree of deference to be given to a plaintiff's choice of forum

moves on a sliding scale depending on several relevant considerations." Id. As such, a plaintiff's choice of forum should receive greater deference where it appears that there is a bona fide connection between the plaintiff or the lawsuit and the forum, or that the plaintiff was sincerely concerned with convenience in choosing that forum, and less deference is warranted when it appears that the choice of forum was motivated by forum shopping. Id. at 72.[2]

After considering the parties' arguments in the context of the standard announced in Iragorri, this Court concludes that OPS's choice of forum is entitled to less than substantial deference. First, less deference is appropriate because ECS, and not OPS or Field, is the real party in interest. Second, the acts that are central to plaintiff's claims, and the evidence necessary to resolve such claims, are overwhelmingly found in Sweden and England. It is thus unlikely that plaintiff's choice of forum was based upon sincere concerns as to the most convenient forum to litigate this action.

---

[2] The Second Circuit highlighted some factors to assist a district court with making this determination. Iragorri, 274 F.3d at 72. Specifically, factors that support a plaintiff's choice of forum include the convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence in the chosen forum, defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense. Id. Alternatively, factors that would decrease the level of deference include attempts to win a tactical advantage resulting from local laws, generosity of juries in the United States or in the forum district, the litigant's popularity, or their adversaries' unpopularity, in the district, or the inconvenience and expense of defending the suit in that jurisdiction. Id.

11

## 1. Real Party In Interest

The presumption in favor of OPS's choice of forum is weakened, despite the fact that OPS is a New York corporation, because the real party in interest is ECS, a foreign corporation organized under the laws of the United Kingdom. See Capital Currency Exch., N.V. v. Nat'l West-Minster Bank PLC, 155 F.3d 603, 612 (2d Cir. 1998) ("Because the real parties in interest are foreign corporations, there is not a strong presumption in favor of plaintiffs' choice of forum."); BlackRock, Inc. v. Schroders PLC, No. 07 Civ. 3183, 2007 U.S. Dist. LEXIS 39279, at *12-13, *15 (S.D.N.Y. May 30, 2007) (Leisure, J.) (finding that strong deference to plaintiff's choice of forum was not warranted, despite the named plaintiff's connection to New York, where it was unclear whether the named plaintiff was the real party in interest or whether the lawsuit itself was sufficiently connected to this forum); VictoriaTea.com, Inc. v. Cott Beverages Can., 239 F. Supp. 2d 377, 381 (S.D.N.Y. 2003) (explaining that "where the local claimant is only nominally American, as in the case of an assignee of a foreign corporation, the 'courts have generally refused to give special deference' to plaintiff's choice of forum" (citing Pain v. United Techs. Corp., 637 F.2d 775, 797-98 (D.C. Cir. 1980))). This is particularly true, where, as here, OPS was not formed until after all the acts that are the subject of this dispute

12

occurred. See VictoriaTea, 239 F. Supp. 2d at 381-82 (concluding
that plaintiff was entitled to less deference where plaintiff
was a licensee of the real party in interest and plaintiff was
formed two years after the date of the relevant agreement and
one year after all of the operative events at issue occurred);
see also Aguas Lenders Recovery Group, LLC v. Suez S.A. Sociedad
General De Aguas De Barcelona S.A., No. 06 Civ. 7873, 2008 U.S.
Dist. LEXIS 16283, at *17 (S.D.N.Y. Mar. 3, 2008) (holding that
plaintiff's choice of forum is entitled to less deference where
plaintiff, a New York corporation that was incorporated on the
same day the lawsuit was filed, was created to represent the
interests of mostly foreign entities).

Similarly, Field is not the real party in interest in this
dispute. As such, the Court's decision to accord less than
substantial deference to plaintiff's choice of forum is not
altered by the fact that Field now resides in the United States.
Field became a permanent resident of Massachusetts in November
2006, after defendants allegedly perpetrated the fraud against
ECS. (See Field Decl. ¶ 2.) More importantly, Field chose to
establish and operate ECS in Sweden and England and he should
therefore not be surprised that he would need to litigate his
corporation's claims in those jurisdictions. See LaSala v. Bank
of Cyprus Public Co. Ltd., 510 F. Supp. 2d 246, 257 (S.D.N.Y.
2007) (Haight, J.) ("[I]n the Second Circuit, that deference *is*

13

diminished when 'plaintiff is a corporation doing business abroad and can expect to litigate in foreign courts.'" (citing Guidi v. Inter-Continental Hotels Corp., 224 F.3d 142, 147 (2d Cir. 2000))); see also Cortec Corp. v. Erste Bank Ber Oesterreichischen Sparkassen AG (Erste Bank), 535 F. Supp. 2d 403, 408-09 (S.D.N.Y. 2008) (explaining that plaintiff's choice of forum is not entitled to substantial deference where plaintiff is a corporation, not an individual, and where even if the court treated the CEO of the plaintiff corporation as the plaintiff in the case, he was not the sort of individual plaintiff that this factor is designed to protect, as he executed an agreement in a foreign country with knowledge of how that country's business environment and law works); BFI Group Divino Corp. v. JSC Russian Aluminum, 481 F. Supp. 2d 274, 280 (S.D.N.Y. 2007) (finding that "'where an American chooses to invest in a foreign country and then complains of fraudulent acts occurring primarily in that country, the plaintiff's ability to rely upon citizenship as a talisman against forum non conveniens dismissal is diminished.'" (quoted references omitted)), aff'd, 298 F. App'x 87, 91 (2d Cir. 2008) (affirming district court's decision that plaintiff was not entitled to significant deference where district court weighed plaintiff's citizenship against the fact that plaintiff had chosen to invest abroad).  In fact, Field appears to have incorporated under the

14

laws of the United Kingdom because ECS would be unable to collaborate with certain business ventures, i.e., internet gambling and pornography, in this country. (See Svenska Mem. 1.) It is unfair for Field to take advantage of the laws of the United Kingdom, and limit personal liability to himself through a corporate structure, and now ask this Court to disregard the corporate structure in determining whether this action should be litigated here.

### 2. Convenience of this Forum

Plaintiff's choice of forum deserves less than substantial deference because the allegations giving rise to this lawsuit focus on activity that occurred in Sweden and England.  The essence of this dispute is that two Americans (the Nolter defendants) whose company was, at least partially, operating in Sweden, a British company (Factor Europe), a Swedish citizen (Johansson), and a Swedish bank (Svenska) allegedly swindled a British company (ECS) out of $6 million.  The only relevant acts to this allegedly fraudulent scheme that arguably occurred in the United States were ECS's discussion with Houri in Florida, which purportedly caused ECS to enter its agreement with Scandorder. (See Compl. ¶¶ 16-18, 65; Field Decl. ¶ 6.) According to plaintiff, however, ECS's decision to contract with Scandorder was largely based upon Svenska's role as Scandorder's acquiring bank, which plaintiff alleges Scandorder only achieved

through bribes and kickbacks to Svenska employees in Sweden.
(See, e.g., Compl. ¶¶ 23, 58, 61, 66, 68, 78-79, 83-84; Field
Decl. ¶ 7.) As such, central to all of plaintiff's claims are
how Svenska established the acquiring bank relationship and how
that relationship was used to defraud ECS of its money. These
events all occurred in Sweden and England. Accordingly, the
most significant facts, events, and actions that gave rise to
this dispute occurred in Sweden and England, and not in the
United States, thereby reducing the level of deference that
should be accorded to plaintiff's choice of forum. See Aguas
Lenders, 2008 U.S. Dist. LEXIS 16283, at *18 (according little
deference to plaintiff's choice of forum where "the operative
facts upon which the litigation is brought bear little material
connection to the chosen forum" (citing Nieves v. Am. Airlines,
700 F. Supp. 769, 772 (S.D.N.Y. 1988) (Leisure, J.))).

Moreover, because the dispute arises out of acts that
allegedly occurred in Sweden and England, the majority of the
relevant documents and witnesses are also likely to be found in
those countries, minimizing the likelihood that this forum was
chosen for its convenience. As discussed in more detail below,
the relevant documents are likely to be in Sweden and England,
as documents concerning the bank-related activity are maintained
where the bank is headquartered and where the relevant accounts
are maintained. (See Svenska Decl. ¶¶ 3, 4.) Similarly, the

Svenska employees who have information as to how the accounts were established and what happened to the funds deposited in those accounts are likely to reside in Sweden or in England.

Despite the existence of Svenska's New York office, plaintiff is unable to identify, and there is no reason for this Court to believe, that Svenska's New York branch has any relevant information to this suit, since none of the relevant events involved the New York branch. Moreover, many of the relevant documents related to Johansson and Factor Europe are likely to be found in Sweden, as that is where Johansson is being tried for crimes related to the acts at the root of plaintiff's allegations in this action. (See Decl. of Fredrik Schultz, sworn to on Sept. 8, 2008 ("Schultz Decl.") Ex. A.)[3]

In addition, the fact that Scandorder processed ECS's New York customers' transactions does not increase the deference that should be accorded to plaintiff's choice of forum.   In particular, other than Menzia, a limited liability company organized and existing under the laws of the Republic of Cyprus (see Compl. ¶¶ 13-14), OPS does not specify any other consumers

---

[3] Svenska submitted the information pertaining to the criminal proceedings against Johansson in its supplemental briefing on this motion.   This Court granted Svenska's request to file supplemental briefing, and provided plaintiff with an opportunity to oppose Svenska's additional arguments. (See Order Granting Leave to Supplement Svenska Handelsbanken AB's Motion to Dismiss, September 10, 2008, Docket No. 25.)

17

who assigned OPS its interest.[4]    As such, because OPS is not

representing the interests of any of ECS's New York customers,

this Court is not persuaded that plaintiff chose this forum for

its convenience to those customers.  Moreover, the complaint

suggests that it is OPS, through the assignment of claims from

ECS, which suffered $6 million in damages because of defendants'

actions.  Any testimony from ECS's consumers in New York is

likely to be only marginally helpful to plaintiff in its effort

to prove that it suffered such damages.

Finally, even assuming that Field has "in [his] possession

in Massachusetts all of ECS' documents pertaining to its

business interactions, including the transactions that are

subject of this litigation" (Field Decl. ¶ 2.), the existence of

that evidence in the United states does not persuade this Court

to accord the same level of deference available to a plaintiff

suing in his home forum for a dispute that has a connection to

that forum.  Just as a plaintiff cannot increase the connection

to this forum by suing in another party's name, see Capital

---

[4] The Court has placed under seal the documents attached to the Field
Declaration as the annexed information revealed personal information of non-
parties to this litigation.  In particular, the Court finds it improper to
file publicly names, e-mail addresses, phone numbers, and the IP addresses of
individuals who are not parties to this suit and who did not give permission
for such public filing. See Fed. R. Civ. P. 5.2 (requiring redaction when
papers contain an individual's social-security number, taxpayer-
identification number, birth date, the name of a minor, or a financial-
account number); see also Fed. R. Civ. P. 5.2 advisory committee's note
(recognizing that it might be necessary to protect information not
specifically covered by the redaction requirements of Rule 5.2).

Currency, 153 F.3d at 612; BlackRock, 2007 U.S. Dist. LEXIS
32979, at *12-13; VictoriaTea, 234 F. Supp. 2d at 381, a
plaintiff cannot move evidence to this forum and suggest that
the existence of that evidence increases the level of deference
this Court should give to plaintiff's choice of forum.[5]

Because OPS and Field are not the real parties in interest,
and the essence of this dispute has minimal connection to the
United States, plaintiff's choice of forum is entitled to less
than substantial deference.

## B.   Adequate Alternative Forum

Even when according a plaintiff's choice of forum less than
substantial deference, a complaint is not properly dismissed
under the doctrine of forum non conveniens unless a suitable
alternate forum for the dispute exists. See Norex, 416 F.3d at
159 ("We here clarify that a case cannot be dismissed on grounds
of forum non conveniens unless there is presently available to
the plaintiff an alternative forum that will permit it to
litigate the subject matter of its dispute."); see also Cortec,
535 F. Supp. 2d at 409 (discussing need for a presently

---

[5] Even if this Court accepts that plaintiff had some legitimate reasons for
bringing this suit in this forum such that this Court should accord greater
deference to plaintiff's choice of forum, Svenska has demonstrated that the
private and public factors overwhelmingly favor dismissal, such that
dismissal would be warranted even according a higher level of deference to
plaintiff's choice of forum. See Iragorri, 274 F.3d at 74 ("As is implicit in
the meaning of 'deference,' the greater the degree of deference to which the
plaintiff's choice of forum is entitled, the stronger a showing of
inconvenience the defendant must make to prevail in securing forum non
conveniens dismissal.").

available alternative forum prior to dismissal on grounds of forum non conveniens). The movant has the burden to prove that there is an adequate forum elsewhere, but the standard imposed on a defendant to establish such adequacy is not heavy. Mastafa v. Austl. Wheat Bd. Ltd., aka AWB Ltd., No. 07 Civ. 7955, 2008 U.S. Dist. LEXIS 73305, at *22 (S.D.N.Y. Sept. 25, 2008) ("The requirements for establishing that a forum is adequate are not strenuous."). It is well established that an alternative forum is generally adequate if the defendants are amenable to suit in the other forum and the forum permits litigation of the subject matter of the dispute. See, e.g., Cortec, 535 F. Supp. 2d at 409; Aguas Lenders, 2008 U.S. Dist. LEXIS 16283, at *14; BFI Group, 481 F. Supp. 2d at 280.

Svenska submitted the declarations of Claes Lundblad, a partner at the Swedish law firm Mannhimer Swartlin Advokatybrå, and Anthony John De Garr Robinson QC, a barrister practicing from One Essex Court and who was awarded Queen's Counsel, in support of its argument that Sweden and England are adequate alternative fora for this dispute. (See Decl. of Claes Lundblad, sworn to on Dec. 14, 2007 ("Lundblad Decl."); Decl. of Anthony John De Garr Robinson QC, sworn to on Dec. 11, 2007 ("Robinson Decl.").) It is uncontested that both Sweden and England permit litigation of the subject matters in this dispute. (See Lundblad Decl. ¶¶ 21-29; Robinson Decl. ¶¶ 61-76.) OPS's opposition to

Sweden as an adequate alternative forum is limited to its argument that Svenska is unable to demonstrate that Swedish courts have jurisdiction over the Nolter defendants. (See Pl.'s Opp'n 6-7.)  Contrary to plaintiff's assertion, Svenska provided an uncontested expert opinion that sets forth several ways in which the Nolter defendants can be subject to jurisdiction in Sweden. (Lundblad Decl. ¶¶ 18-19.)  Notably, if the Nolter defendants committed torts in Sweden, which appears to be plaintiff's theory of liability, they are subject to the jurisdiction of the Swedish courts. (See id.)

In opposition to the availability of England as a viable alternative forum for the litigation of this case, OPS argues that because Svenska suggests that the core events and witnesses are located in Sweden, England cannot be considered an adequate alternative forum. (See Pl.'s Opp'n 7-8.)  In particular, plaintiff suggests that an English Court is likely to dismiss this case as New York is more, or at least as suitable, for litigating this action. (Id. at 7.)  Plaintiff, however, ignores the undisputed conclusion presented in the Robinson declaration that "[i]n this case, it would be extremely difficult to persuade [an English] court that there is another forum which is as suitable or more suitable than England." (Robinson Decl. ¶ 88; see also id. at ¶ 91 ("In summary, my view is that the English [courts] could and would exercise jurisdiction over all

21

the defendants in this case.").)  Moreover, out of an abundance
of caution, this Court will impose conditions on this dismissal,
outlined below, that will protect plaintiff from the concerns
raised in its opposition papers, including that an English Court
might decline to exercise jurisdiction on a basis similar to the
doctrine of forum non conveniens.

Based upon the uncontroverted declarations suggesting that
courts in both Sweden and England can and would hear this case,
this Court has a justifiable belief that both Sweden and England
are adequate alternative fora for adjudication of this case. See
Bank of Credit & Commerce Int'l (Overseas) Ltd. v. State Bank of
Pak., 273 F.3d 241, 248 (2d Cir. 2001) (explaining how district
courts can conditionally dismiss a case based upon a
"justifiable belief" as to the existence of an adequate
alternative forum); Strategic Value Master Fund, Ltd. v. Cargill
Fin. Servs. Corp., 421 F. Supp. 2d 741, 756 (S.D.N.Y. 2006)
(Leisure, J.) (discussing Court's ability to condition dismissal
to ensure adequacy of alternative forum if the Court asserts its
"justifiable belief" in the existence of adequate alternative
forum); Lo v. Amsterdam & Sauer Ltd. (Inc.), No. 91 Civ. 4389,
1992 U.S. Dist. LEXIS 13395, at *22 (S.D.N.Y. Sept. 8, 1992)
(Leisure, J.) (conditionally dismissing case where it was not
clear whether defendant would be subject to the jurisdiction of
the courts of Brazil).  Accordingly, the Court will condition

its dismissal of this case upon a foreign court's willingness to hear the case, upon a foreign court's jurisdiction over all defendants,[6] and upon all defendants effectively waiving any jurisdictional defenses or any defenses based upon statute of limitations that may have arisen since the filing of the case in the present forum.

### C.   Balancing the Private and Public Interest Factors

Having determined that adequate alternative fora exist, this Court proceeds to the third step in the <u>forum non conveniens</u> analysis, which is to weigh two sets of factors to determine whether adjudication is more appropriate in the present forum or in an alternative forum.  The first set of factors concerns the private interest factors, or the

---

[6] Plaintiff asserts that "[w]hile [Svenska] may claim that it would consent to jurisdiction abroad, the fact of the matter is that no other Defendant has similarly given such consent." (Pl.'s Opp'n 7.)  While plaintiff correctly observes that the other named defendants have not consented to jurisdiction in Sweden or in England, those parties have also not appeared in this action. As such, the fact that those defendants did not make a representation to this Court that they would submit to jurisdiction abroad does not overcome the Court's belief, based upon Svenska's uncontested declarations, that these other defendants can be sued in Sweden and England. See <u>Zweig v. Nat'l Mortgage Bank of Greece</u>, No. 91 Civ. 5482, 1993 U.S. Dist. LEXIS 8460, at *27 (S.D.N.Y. June 17, 1993) (finding Greece to be an adequate alternative forum where one of the defendants had not appeared in the action but it appeared that this defendant would be subject to jurisdiction in Greece, whereas his amenability to suit in New York was precarious).  Moreover, the Court notes that while OPS filed a typed, unsigned document dated January 30, 2008, which contains the subject line "Re: Lawsuit: Online Payment Solution, Inc. a New York corporation plaintiff and Eric Nolter and Nick Nolter defendants. Answer of summons dated January 09, 2008" (<u>see</u> Docket No. 20), the Court does not consider this document to be a responsive pleading on behalf of the Nolter defendants, as it is not signed by any party and it was filed by plaintiff. Finally, in light of the criminal charges proceeding against Johansson in Sweden (<u>see</u> Schultz Decl. Ex. A), it does not appear likely that Johansson will appear in this forum to defend the claims asserted against him. Regardless, this Court is confident that plaintiff's rights are adequately protected by the conditions this Court has placed on this dismissal.

convenience of the litigants. Iragorri, 274 F.3d at 73.  The
second set of factors the Court must consider are the public
interest factors of justice and court efficiency. See id. at 74.

"Because much of the [forum non conveniens] doctrine's
strength derives from its flexibility and each case turns on its
own facts, a single factor is rarely dispositive." DiRienzo v.
Philip Servs. Corp., 294 F.3d 21, 29 (2d Cir. 2002).

### 1. Private Interest Factors

The private interest factors address the convenience to the
litigants.  These factors include

> "the relative ease of access to sources of proof;
> availability of compulsory process for attendance of
> unwilling, and the cost of obtaining attendance of
> willing, witnesses; possibility of view of premises,
> if view would be appropriate to the action; and all
> other practical problems that make trial of a case
> easy, expeditious and inexpensive."

Iragorri, 274 F.3d at 73-74 (quoting Gilbert, 330 U.S. at 508).
In considering these private interest factors, the Court is
"necessarily engaged in a comparison between the hardships
defendant[s] would suffer through the retention of jurisdiction
and the hardships the plaintiff would suffer as the result of
dismissal and the obligation to bring suit in another country."
Id. at 74.

Of these private interest factors, the parties focus almost
exclusively on the first two factors, (1) the ease of access to
the evidence, and (2) the availability of compulsory process for

attendance of unwilling witnesses, and the cost of obtaining
attendance of willing witnesses.  The Court agrees that, in
evaluating the burdens on the parties in this case, the most
pertinent private interest factors are where the evidence is
actually located, whether such evidence can be brought to this
Court, and how much it would cost the parties to bring the
available evidence to this Court.  By contrast, the third factor
– inspection of the premises – is inapposite, as there are no
premises at issue in this case.  Similarly, the parties do not
raise, nor is this Court aware of, any other considerations that
are relevant to assessing the costs or convenience to the
parties in this case, which is the fourth of the private
interest factors.  Thus, after considering the parties'
arguments as to the applicable private interest factors, the
Court concludes that these factors strongly weigh in favor of
dismissal.

    In coming to this conclusion, the Court focuses on the
specific evidence relevant to the "precise issues that are
likely to be actually tried."  Iragorri, 274 F.3d at 74.
Plaintiff asserts five causes of action in its complaint: (1) a
claim for conversion against Johansson, the Nolter defendants,
and Factor Europe, (2) a claim of aiding and abetting such
conversion against Svenska, (3) a claim of aiding and abetting
fraud against Svenska, (4) a claim of negligence against

25

Svenska, and (5) a claim that all defendants are in violation of the New York Uniform Deceptive Trade Practices Act. (See generally Compl. ¶¶ 47-86.)  After a careful review of the factual allegations that plaintiff asserts in support of those causes of action, it is clear that the majority of the evidence that the parties will rely upon in prosecuting and defending this lawsuit exists abroad.  It is also clear that on balance, the costs associated with litigating this case in this forum are significantly more burdensome on both plaintiff and defendants than if plaintiff was to bring this case in a foreign court, namely, either Sweden or England.

In particular, with respect to plaintiff's conversion claim, and its claim of aiding and abetting the same, plaintiff contends that defendants came into possession of over $6 million of plaintiff's money, which were funds sent from Visa or Mastercard in settlement of ECS's customer's credit card transactions. (See Compl. ¶¶ 42, 48-52.)  Those funds were purportedly sent to Factor Europe's account at Svenska's London branch, and were never sent to ECS, the proper recipient. (Id.)  It is plaintiff's contention that Svenska facilitated such conversion by allowing its employees to accept bribes and payoffs in exchange for creating the relevant acquiring relationships and merchant accounts. (See id. ¶¶ 58, 60-61.)  It follows that the evidence relevant to these claims exists in

Sweden and England, where these purported kickback arrangements were entered into and where the bribes were paid.

In addition, much of the evidence related to Johansson and Factor Europe's role in this purported scheme is likely to exist in Sweden because of the criminal charges currently proceeding against Johansson. (See Schultz Decl. ¶ 4 (explaining that there are over 5,000 pages of documentation on file with the Stockholm District Court).) Plaintiff correctly notes that in addition to Johansson there are several other individuals named in the Swedish criminal complaint, and that some of the criminal tax evasion and book-keeping violations alleged are likely irrelevant to this dispute. (See Pl.'s Supp. Opp'n 2.) However, the facts asserted in the complaint filed by the Swedish National Economic Crimes Bureau suggest that Johansson is being charged with a crime that is of the same nature, and based upon many of the same acts, as OPS alleges give rise to its claims in the instant action. (See Schultz Decl. Ex. A at 4, 6.)[7]

---

[7] The allegations on the fourth page of the translation of the criminal complaint are illustrative of the overlap of factual assertions made in the instant case and in the criminal proceedings in Sweden. The criminal complaint alleges:

> As part of the misleading [activity], [SNL] produced and offered a payment intermediation system that outwardly gave paying banks and credit card companies misleading information about what was being purchased. . . As part of the profit distribution, payments took place via the English company Factor Europe Ltd. controlled by Peter Johansson to foreign companies, banks and accounts belonging to Johansson [and the other defendants in the Swedish criminal proceeding]. Factor Europe Ltd.'s role was primarily to prevent insight into payment transactions that were brought about or primarily based on the joint

27

Moreover, documentation as to Svenska's investigation of the accounts and acquiring activities in Sweden are maintained by its auditing department in Sweden, and such documents would be in Swedish. (See Svenska Decl. ¶ 4.)  Similarly, Svenska's audit department in London would conduct investigations and maintain information as to the accounts and acquiring activities occurring in London. (See id.)  The Court is mindful that with the current level of technology available to international companies such as Svenska, the costs of transporting documents are not as prohibitive as they once were. See Gilstrap v. Radianz Ltd., 443 F. Supp. 2d 474, 488 (S.D.N.Y. 2006) (acknowledging that "in the era of electronic discovery, this factor carries less weight than in the day of [Gilbert]"), aff'd, 233 F. App'x 83 (2d Cir. 2007).  The Court, however, finds that where, as here, the majority of relevant evidence is located abroad, the burden imposed on the parties is still significant and favors dismissal. See id. at 488.  Moreover, the

---

venture agreement. . . The criminal plan further included paying compensations/salaries/kickbacks from the company's activity to employees or others who provided services in such a way that they would not be visible or otherwise be clear from the company's bookkeeping.

(Schultz Decl. Ex. A at 4.)  Contrary to plaintiff's assertions, the fact that plaintiff is unable to join as a party to the criminal action (see Pl.'s Supp. Opp'n 7), or the fact that these proceedings are not "genuine parallel proceeding[s] abroad" (id. at 9) does not make this information irrelevant to Svenska's forum non conveniens motion (see id. at 2).  Rather, the overlap of evidence and similarity of charges between this case and the criminal action in Sweden suggest that much of the relevant evidence for this litigation exists in Sweden, and that Sweden has a significant interest in resolving the instant dispute.  These considerations are relevant to both the public and private interest factors under the Second Circuit framework for resolving forum non conveniens motions.

Court finds that the costs of translating much of the relevant documentary evidence would be great and further supports dismissal. See Cortec, 535 F. Supp. 2d at 412 (explaining that the court's analysis "must include the private cost of providing certified translations of hundreds of pages of documentary evidence").

Like the documentary evidence, Svenska employees at headquarters and in the London branch are crucial for plaintiff to establish, and for defendants to oppose, OPS's conversion claims. (See, e.g., Compl. ¶ 32 (alleging that Svenska employees Paul Breakspeare and Sarah Gustafson were reassigned to London and Sweden, respectively, because of their suspected involvement in improperly opening the accounts at issue in this case).) While plaintiff correctly notes that Svenska employees are under the control of Svenska (see Pl.'s Opp'n 12), this Court need not ignore the fact that none of the Svenska employees with information relevant to this case are in the United States. Rather, even if the prospective witnesses are in Svenska's control, and therefore could be produced for trial in this Court, the Court must still consider the costs of producing these witnesses, which would be substantial. See Gilstrap, 443 F. Supp. 2d at 488.  Further, because it is likely that any testifying Svenska employees from Sweden would require an interpreter, the burdens associated with translating their

testimony in this Court also support dismissal. See LaSala, 510 F. Supp. 2d at 261 (discussing the problems of obtaining testimony through an interpreter, which in addition to the financial costs of such translation, include the difficulties of assessing witness credibility).

Like the conversion claims, plaintiff's fraud, negligence, and breach of the New York Uniform Deceptive Trade Practices Act claims are premised on factual allegations that will require the presentation of documents and witnesses that are primarily located in Sweden and England. According to plaintiff, Svenska concealed the fact that its banking relationships with defendants were the product of kickbacks and bribes, and that, through misrepresentations and negligence, Svenska failed to adequately investigate Scandorder, the Nolter defendants, Johansson, and Factor Europe before endorsing them. (See Compl. ¶¶ 65-68, 71-72, 79-80, 83-85.) Accordingly, the testimony of Svenska employees who had the responsibility to approve and investigate these defendants before entering into the banking relationships at issue in this case will be crucial to resolving these claims. None of these employees are located in the United States.

In addition, while plaintiff claims that Svenska failed to comply with the Visa/Mastercard rules and regulations, thereby encouraging plaintiff to think that defendants were legitimate

companies with legitimate business practices, (see id. ¶¶ 65-68,
73-74, 78, 80-81, 83-84), the decisive question is not whether
Svenska actually failed to follow the Visa/Mastercard rules and
regulations, but whether Svenska ignored these rules and engaged
in other improper practices to promote and assist a fraudulent
scheme.  As such, plaintiff overestimates the relevant evidence
that Visa and Mastercard, who are not parties in this action,
might produce in this case.  At best, any evidence that those
entities might provide is peripheral to the main issues at stake
in this case.  Thus, regardless of the fact that it might be
more convenient for Visa and Mastercard to produce information
if this action were proceeding in this Court, as those
corporations are allegedly headquartered in California and New
York, respectively (see Pl.'s Opp'n 9; Field Decl. ¶ 7), the
minimal amount of relevant evidence they might provide does not
outweigh the burdens associated with bringing the vast majority
of relevant evidence to this Court.

Plaintiff also overstates the import of testimony from
Scandorder witnesses, and Houri in particular, who are located
in the United States and could provide relevant testimony during
trial. (See Pl.'s Opp'n 9, 12.)  Houri purportedly represented
to Field that Scandorder was an established credit card
processing company, with an existing merchant relationship with
Svenska. (Field Decl. ¶ 6.)  Based on Houri's representations

and his compelling description of the processing software to Field, ECS entered into an arrangement with Scandorder. (Id.) While ECS's arrangement with Scandorder is obviously relevant to this dispute, the testimony plaintiff expects to elicit from Houri - namely his description of the processing technology and the existence of the merchant account with Svenska - is not integral to the resolution of this case. As explained above, plaintiff's allegations regarding Scandorder's acquiring bank relationship with Svenska focus on Svenska's role in entering into that relationship after receiving bribes and kickbacks, and absent the required and expected investigations. (See Compl. ¶¶ 24-26, 58, 60-62, 66-69, 73, 79, 83.) Houri's testimony would not help plaintiff establish those allegations. Most importantly, even if Houri's testimony would be helpful to plaintiff establishing that ECS was told that Scandorder had a relationship with Svenska, it appears that Houri resides in Florida (see Pl.'s Opp'n 9), which is outside this Court's subpoena power. See Fed. R. Civ. P. 45(2) (explaining that a subpoena can be served within 100 miles of the place of trial.) Thus, this Court could not compel Houri's testimony, and Houri would only be available to testify in this Court if he volunteers to provide such testimony.

Plaintiff similarly exaggerates the need for evidence from ECS's New York consumers. (See Pl.'s Opp'n 9, 12.) This Court

is not persuaded that those non-party consumers are likely to have testimony or evidence that is essential to plaintiff's demonstrating that it was damaged by defendants' fraudulent scheme.   The fact that ECS had New York consumers that might have used the credit card processing technology at issue does not make it more or less likely that ECS was damaged in the amount of $6 million. See LaSala, 510 F. Supp. 2d at 259 ("While the witnesses mentioned by plaintiff undoubtedly would have something to say about the overall scheme . . . I fail to see how they will assist a fact-finder in determining what [the defendant bank's] employees knew and did surrounding the particular accounts at issue in this case.").   In fact, plaintiff concedes that the merchants using Scandorder processing systems are only marginally relevant to this dispute. (Pl.'s Opp'n 12 ("Menzia and any other merchants in reality have no firsthand information other than they know they lost their money . . . .").)

Finally, the Court recognizes that Field and his wife, Jodi Ladakakos Field, are important witnesses for plaintiff's case. (See Pl.'s Opp'n 9, 10, 12; Field Decl. ¶¶ 1-2, 5, 9, 16.)   The Court is mindful of the costs associated with Mr. and Mrs. Field's testifying in Sweden or England.   Nevertheless, even assuming that plaintiff does not intend to call any former ECS employees residing in England as witnesses, and that Mr. and

33

Mrs. Field are the primary witnesses for the company, their convenience in testifying in the United States is outweighed because the vast majority of the relevant evidence upon which plaintiff and all defendants are likely to depend on exist in Sweden and in England.

Svenska has demonstrated that, on balance, the burdens on Svenska to defend itself in this forum far outweigh any benefits plaintiff would have in proceeding in this Court.  The evidence, other than what Field transferred from London to Massachusetts, even if located in the United States, is largely irrelevant, or only marginally relevant, to the claims plaintiff advances in this action.  Because the vast majority of necessary witnesses and documentary evidence are most easily, if not exclusively, accessible in Sweden or England, the private interest factors strongly favor dismissal. See BFI Group, 481 F. Supp. 2d at 287 (finding that the private interest factors militate in favor of dismissal where the bulk of the relevant non-testimonial evidence is within plaintiff's control or in foreign countries); Gilstrap, 443 F. Supp. 2d at 488-89 (finding relevant private interest factors weigh in favor of dismissal where key witnesses and the majority of relevant documentary evidence are in England); Strategic Value, 421 F. Supp. 2d at 766 ("Where most of the witnesses and documentary evidence reside in a foreign

country, conducting trial in the U.S. could impose such significant burdens on the parties that dismissal is favored.").[8]

## 2. Public Interest Factors

The Court now turns to those considerations of the forum non conveniens inquiry that protect the public's interest. These factors include: (1) the consideration that jurors should not be obligated to decide disputes with no relation to their community; (2) the fact that where a case affects many people, a forum that allows those affected to view the suit, rather than learn of it by report from a foreign forum, is preferable; (3) the forum's local interest in having its own controversies decided at home; and (4) the potential pitfalls that stem from a diversity case being heard in a foreign forum that must resolve conflicts of law and substantive law problems, rather than a forum familiar with the state law to be applied to the case.[9]

---

[8] The Court is aware that in assessing the availability of evidence that exists abroad, and whether such evidence could be available in this Court, the Court should consider the possibility of using letters rogatory to obtain the foreign evidence. See DiRienzo, 294 F.3d at 30 ("Despite the preference for live testimony, we have recognized the availability of letters rogatory as relevant in deciding whether plaintiffs' chosen forum is inconvenient."). Here, however, while the Court appreciates the value of letters rogatory, the costs associated with bringing the bulk of the documents and testimony to this Court are excessive and unnecessary as compared to the costs and burdens of using such evidence in the courts of Sweden or England.

[9] Gilbert also specifies administrative difficulties resulting from court congestion as a public factor consideration. Gilbert, 330 U.S. at 508-09. This consideration is not presently applicable in this District, however. Cf. Guidi, 224 F.3d at 147 (noting that "the recent filling of all judicial vacancies and the resulting full complement of judges for the District makes this concern of little or no present significance"). Moreover, the parties have provided this Court with no information about the administrative difficulties of trying this case in Sweden or in England that would allow the

35

Gilbert, 330 U.S. at 508-09; Iragorri, 274 F.3d at 74.   After
considering these factors, and given the limited connection of
this dispute to the United States, and the more substantial
interests that Sweden and England would have in deciding this
controversy, the public interest factors weigh heavily in favor
of dismissal.

The first factor - the appropriateness of having jurors
resolve disputes that are not related to their community -
favors dismissal.   As described in great detail above, there is
no alleged harm to any United States party because OPS's claims
are actually the assigned claims of an English corporation.
Moreover, the acts central to plaintiff's fraud and conversion
claims occurred in Sweden and England.   As such, given the
limited connection of this case to the United States, and the
almost non-existent connection to New York, a New York jury has
little interest in adjudicating this dispute.  See BFI Group, 481
F. Supp. 2d at 287 (holding that the burden on jurors militates
in favor of dismissal where "[t]he action essentially amounts to
a dispute between California and Russian companies over their
interactions with the Nigerian government concerning the
purchase of Nigerian government property."); BlackRock, 2007
U.S. Dist. LEXIS 39279, at *31 ("New York jurors have no

---

Court to assess whether those burdens are more or less significant in those
fora as compared to in this Court.

36

connection to this German dispute and should not be burdened with the duty of finding the facts of this case.").

The second of the public interest factors asks this Court to examine whether any non-parties who might be affected by this suit would want the opportunity to observe the proceedings. Here, ECS allegedly served New York consumers (see Field Decl. ¶ 8), which suggests that at least some non-parties in New York might be interested in the outcome of this case. The majority of non-parties with an interest in this suit, however, are likely to be in Europe, since the fraudulent activities were conducted in Sweden and England. This is particularly true of Sweden, since Svenska's acts were central to defendants' alleged scheme, Svenska is one of the largest banks in Sweden (Svenska Decl. ¶ 3), and because of the related criminal proceedings against Johansson currently pending in Sweden. (See generally Schultz Decl.) Nevertheless, because some non-parties in New York might have an interest in this action, this factor does not weigh strongly in favor of dismissal.

The third public interest factor, namely the forum's local interest in having its own controversies decided at home, supports dismissing this case because of the strong connection of this suit to both Sweden and England as compared to that of the United States. See Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 76 (2d Cir. 2003) (affirming lower court's

determination that New York's interest in overseeing a bank, which is headquartered in New York, is not a "strong local interest" compared to England's interest where plaintiffs purchased the investments at issue in England, the alleged fraud and misrepresentations occurred in England, and the breach of contract and fiduciary duty allegations arise out of contracts entered into in England); See Aguas Lenders, 2008 U.S. Dist. LEXIS 16283, at *23 ("A 'tangential connection' to New York does not alone form a basis for denial of a forum non conveniens dismissal."); LaSala, 510 F. Supp. 2d at 262-63 (holding that the United States' interest in "ensuring that American currency not be laundered and that American investors not be defrauded by those who attempt to use foreign banks to further a criminal scheme" pales in comparison to the interest of Cyprus where the banks accounts were opened and the allegedly improper transfers were authorized). Here, the United States' interest in adjudicating this dispute pales in comparison to the interests of both Sweden and England.

This Court finds that Sweden has a particularly strong interest in adjudicating this dispute, as many of plaintiff's allegations focus on Svenska's deliberate misrepresentations as to the validity of Factor Europe's and Scandorder's businesses, and how the relationships between the bank and those entities were only established through bribes and kickbacks. (See, e.g.,

Compl. ¶¶ 58-61, 65-68, 72-74.) Given that Svenska is one of
the largest banks in Sweden (Svenska Decl. ¶ 3), Sweden has a
strong interest in ensuring that such a large entity is not
engaged in, and is ultimately held responsible for, the types of
acts alleged here. Moreover, despite the parties' dispute as to
what impact, if any, the Stockholm District Attorney's criminal
charges against Johansson should have on this motion, this Court
finds that, while not dispositive of the public interest
inquiry, those criminal charges are highly relevant to the
determination that Sweden has a greater public interest in this
lawsuit than the United States. In particular, the basis for
these crimes are Johansson's practices with SNL and Factor
Europe, which directly overlap with the practices and companies
at issue in this case. (Compare Compl. ¶¶ 29-30, 42, 80, with
Schultz Decl. Ex. A at 4, 6, 7.) Sweden has a strong interest
in resolving civil disputes that arise out of the same acts on
which a criminal complaint is based.

England also has more significant interests in adjudicating
this action than the United States. Most notably, at the time
defendants perpetrated this fraud, plaintiff was a corporation
organized, existing, and operating in England. (See Field Decl.
¶¶ 1, 3.) Moreover, despite plaintiff's characterization of
Factor Europe as a "conduit through which funds merely passed"
in order to downplay the significance of Factor Europe in this

39

action (Field Decl. ¶ 15), England is likely to be deeply concerned about domestic entities that have no purpose other than to unlawfully convert and distribute funds.

While it is true that the United States has some interest in this case because ECS was allegedly induced to enter into an agreement with Scandorder in Florida, and because at least some of the credit card processing occurred in the United States (see Pl.'s Opp'n 13), those interests are overcome by the much more significant interests of Sweden and England.  The United States is concerned with Americans (i.e. the Nolter defendants) who allegedly use American corporations to participate in fraudulent activities abroad.  Nevertheless, this is not a situation where the fraud was targeted at Americans, as ECS was not an American company.  Rather, this is an American company, operating in Sweden, which allegedly conspired with Swedish and English entities to deprive another English corporation of its lawful funds.  However, in suggesting that the United States' interests in this case are slight as compared to the interests of Sweden and England, this Court does not imply that the allegations in OPS's complaint are not cause for concern.  The Court merely believes that there are more appropriate and convenient fora to resolve these very serious contentions.  Accordingly, the forum's local interest in having its own controversies decided at home strongly militates in favor of dismissal.

Finally, the fourth factor requires the Court to consider the problems of applying foreign law to the dispute.  Neither OPS nor Svenska provide this Court with sufficient information to make a determination as to what law is likely to govern this dispute.  Svenska contends that this Court need not burden itself with a conflict of law inquiry, and further suggests that New York choice of law rules often point to the law of the place where the loss is sustained, which would dictate the application of the law of England or Cyprus in this case. (See Svenska Mem. 11.)  Svenska further suggests that the contracts relating to Svenska's banking activity are governed by Swedish or English law. (Id.)  By contrast, plaintiff suggests that "Swedish law would hardly apply" and that even if it did apply, it does not require dismissal of this case. (Pl.'s Opp'n 13.)  Based upon these conclusory assertions, the Court is unable to make any reasonable assessment as to which law would govern plaintiff's various causes of action.  Accordingly, this factor does not favor either party.

Overall, however, the public interest factors strongly favor dismissing this case because Sweden and England are two alternative fora with much more significant ties to the dispute. Svenska has demonstrated that this forum is not convenient for any of the parties to this action, and that this dispute is more appropriately adjudicated in either Sweden or England.

41

## CONCLUSION

For all the foregoing reasons, Svenska's motion to dismiss on the basis of forum non conveniens is GRANTED without prejudice to the merits of plaintiff's claims. This dismissal is conditioned upon a foreign court's willingness to hear the case, a foreign court's jurisdiction over all defendants, and upon all defendants effectively waiving any jurisdictional defenses or any defenses based upon statute of limitations that may have arisen since the filing of the case in the present forum. If any of these conditions are not met, plaintiff can apply to restore this case to this Court's calendar.

**SO ORDERED.**

New York, New York
July 27 , 2009

_____
U.S.D.J.